**RJE CORP., Plaintiff,**

v.

**NORTHVILLE INDUSTRIES CORP., Defendant.**

**No. 02–CV–1440 (FB).**

United States District Court, E.D. New York.

April 25, 2002.

John J. Kuster, Jennifer A. Demarrais, Sidley, Austin, Brown & Wood, LLP, New York City, for plaintiff.

Maria T. Vullo, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Defendant.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiff, RJE Corp. ("RJE"), has brought this action, invoking the Court's diversity jurisdiction, against defendant, Northville Industries Corp. ("Northville"), for a declaratory judgment and specific performance.

The parties have a joint interest in a multi-million dollar petroleum pipeline sys-

tem located on Long Island (the "Pipeline System"). They have entered into a certain "Option Agreement" that provides various methods by which the parties can sever their joint interest. Pursuant to the Option Agreement, the parties currently are involved in a closed bidding process whereby the winning bidder will be obliged to buy out the losing bidder's interest in the Pipeline System. The parties disagree as to whether a certain provision in the Option Agreement (the "Abandonment Provision") calling for bids to be based on the "fair market value of the Pipeline System," contemplates a straight asset sale of the Pipeline System, or whether the fair market value must account for future costs which may be required to remediate existing environmental conditions. The resolution of this issue, which is the subject of RJE's declaratory judgment action, will affect the dollar amount of the parties' respective bids and the appropriateness of RJE's request for specific performance to compel Northville to proceed with the bidding process.

Finding for RJE, the Court declares that bids are to be based on the fair market value of the assets comprising the Pipeline System, without offset for the costs of future remediation for existing environmental liabilities, but that, provided certain conditions are met by Northville, specific performance is not warranted.

## BACKGROUND

### I. Procedural Posture of Litigation

RJE initiated its action by Order to Show Cause seeking a preliminary injunc-

tion to stay the bidding process pending the requested declaratory judgment. Because the likelihood of success was so inextricably linked to the Court's assessment of the disputed contract language, the Court prevailed upon the parties to convert the preliminary injunction motion to one for summary judgment since there did not appear to be any reason why the litigation should linger. Consistent with the parties' desire to reach an expeditious final resolution of their dispute, and because of certain time constraints associated with the bidding process, the Court set the matter down for an immediate evidentiary hearing to allow the parties to adduce evidence to support their respective interpretations of the relevant contract language. This extrinsic evidence would, of course, only be relevant in the event the Court were to conclude that the contract language was ambiguous, and hence not subject to the parol evidence rule.[1] The parties agreed that the bidding process would be stayed until seven days after the Court issued its declaratory judgment.[2]

### II. Events Leading to Execution of Relevant Agreements

Prior to September 1988, all of Northville's stock was owned by two factions of the Bernstein family. The Harold Bernstein family held 55.66% of the stock; the Raymond Bernstein family held 44.34% of the stock. Disputes arose between the families that were irreconcilable; accordingly, the families resolved to have Northville buy out the Raymond Bernstein family's stock, leaving the Harold Bernstein

---

1. Since no jury demand has been made, the parties agree that all factual issues are for the Court. *See* Tr. at 3 (Mar. 19, 2002) ("Tr." refers to the transcript of the hearing. The parenthetical indicates which day's transcript is being cited); *see also* Fed.R.Civ.P. 43(e)

(authorizing the court to hold hearings on motions).

2. Northville also asserted several counterclaims; however, it has voluntarily withdrawn them pursuant to Fed.R.Civ.P. 41(a)(1)(i) & (c).

family in sole control of Northville.[3] Included amongst Northville's many holdings was the Pipeline System.

During the course of negotiations, the parties discovered two significant underground gasoline leaks from the Pipeline System. In October 1986, an 800,000 gallon leak was discovered at the Holtsville terminal; in November 1987, a 1.2 million gallon leak was discovered at the Setauket terminal. The leaks gave rise to various governmental investigations and a class action lawsuit. The environmental liabilities associated with these leaks, the extent of which were indeterminable at the time, became an impediment to the culmination of the parties' negotiations. Consideration was initially given to spinning off the Pipeline System into a separate corporation, in which the parties would retain joint ownership in proportion to their Northville stock. This proposal was rejected by both parties after being advised by counsel that the families could be exposed to personal liability because Northville's considerable assets would not be reachable to satisfy remediation claims. See Tr. at 116 (Mar. 19, 2002). Ultimately, the parties addressed the environmental problems, as well as all other matters relevant to the stock sale, in a series of agreements executed during the summer and fall of 1988, the last ones being executed on September 29, 1988. Relevant to this litigation, in addition to the Option Agreement (dated September 29, 1988), see Pl.Ex.[4] 2, they included the underlying Stock Purchase Agreement (dated September 23, 1988), see Pl.Ex.1; a Consulting Agreement (dated July 1, 1988), see Pl.Ex. 4; and a Purchase Price Adjustment Agreement ("PPAA") (dated September 29, 1988), see Pl.Ex. 3. RJE was incorporated by the Raymond Bernstein family for the purpose of entering into these agreements. All of these agreements were drafted by RJE, except the PPAA, which was drafted by Northville.[5]

## III. Relevant Provisions of Agreements

### A. Stock Purchase Agreement

The Stock Purchase Agreement provided that Northville would purchase all of RJE's Northville stock. Prior to the discovery of the leaks, the parties had come to a joint understanding that the entire value of Northville's stock was $57.5 million,[6] plus various other consideration not relevant to this litigation. See Tr. at 100 (Mar. 19, 2002) After discovery of the leaks, the parties reduced this value by $30 million. See Tr. at 108; Def. Ex.[7] C. Accordingly, the agreement provided that the purchase price for RJE's stock would be approximately $27.5 million, plus the various other consideration. See Tr. at 108, 150 (Mar. 19, 2002). Under the agreement, Northville was to maintain and operate the Pipeline System.

---

**3.** Northville, a major industry on Long Island, had humble beginnings. As Harold Bernstein recounted, the business was started by Harold and Raymond's father, Samuel, as a coal company, and Harold "shoveled coal." Tr. at 185 (Mar. 19, 2002). Unfortunately, the business' success did not contribute to filial harmony amongst Samuel's offspring. As Harold acknowledged, the families "don't speak to each other." Tr. at 186 (Mar. 20, 2002).

**4.** "Pl.Ex." refers to exhibits introduced by the plaintiff at the hearing.

**5.** Presumably, the Raymond Bernstein family transferred its stock to the newly formed corporation prior to RJE's execution of each of the agreements.

**6.** All dollar amounts greater than $1 million have been rounded to the nearest $100,000.

**7.** "Def. Ex." refers to exhibits introduced by the defendant at the hearing.

## B. Consulting Agreement

The Consulting Agreement was signed relatively early in the negotiations. As best the Court can glean from this agreement, it was executed prior to the other agreements so that the Raymond Bernstein family members would leave their management positions at Northville, thereby allowing Northville to negotiate directly on behalf of the Harold Bernstein family. This was presumably done with the recognition that the negotiations underway would result in the Harold Bernstein family's sole control of Northville.

The Consulting Agreement required Northville to provide RJE with an annual "consulting fee" of $840,000, in return for which RJE was obligated to furnish up to twenty hours a month of "consulting and advisory services" upon Northville's request. Consulting Agreement § 3 ("Extent of Services"). In practice, as Northville's attorney explained, RJE received the "consulting fee without providing any services or any benefit." Tr. at 173–74 (Mar. 19, 2002). Northville's obligation to pay the consulting fee was terminable only upon severance of the parties' joint interest in the Pipeline System pursuant to the Option Agreement. *See* Consulting Agreement § 5 ("Termination Provision").

## C. Option Agreement

The Option Agreement provided for five methods by which the parties could sever their joint interest in the Pipeline System: (1) Sale Provision; (2) Right of First Refusal Provision; (3) Purchase Option Provision; (4) Purchase Option Termination Provision, and (5) Abandonment Provision.

The Pipeline System is defined in the preamble of the Option Agreement:

[T]he properties and assets of every kind, nature and description, real, personal and mixed, tangible or intangible, including the rights to use properties or assets of another person, which constitute a network of terminals and pipelines on Long Island, New York (the "Pipeline System") . . . all of which properties and assets being more particularly described on Annex A hereto (the "Pipeline Assets").

Option Agreement at 1. Annex A includes a detailed list of the assets comprising the Pipeline System including, *inter alia,* land, buildings and other structures, fuel storage tanks, docks, piers, appliances, equipment, machinery, pipes, automobiles, trucks, furniture, and supplies. *See* Option Agreement at Annex A.[8]

**Sale Provision & Right of First Refusal Provision:** Under the Sale Provision, Northville could sell to a third party at any time, except during a 180–day period "beginning with the anniversary of five years from the date [of execution of the Option Agreement.]" Option Agreement § 1.01; *see* Option Agreement § 2.02 ("Sale Provision") (incorporating 180–day period defined in Option Agreement § 1.01). Under the Right of First Refusal Provision, before Northville could sell to a third party, RJE had the option to buy the Pipeline System "at a price equal to the price offered [by the third-party] upon the same terms and conditions [offered by the third-party]." Option Agreement § 2.01 ("Right of First Refusal Provision"). If Northville sold the Pipeline System to a third party, RJE would receive "44.34% of [ ] sale proceeds or other consideration," subject to adjustments for tax liabilities and insurance proceeds. Option Agreement § 2.02.

**Purchase Option Provision:** If Northville did not sell the Pipeline System dur-

---

8. Annex A also makes reference to the assignment of contracts, licenses and insurance policies, which presumably may carry with them certain obligations.

ing the first five years, RJE had the right under the Purchase Option Provision to purchase the Pipeline System during the ensuing 180–day period for $16.7 million,[9] subject to certain enumerated adjustments. *See* Option Agreement § 1.01 ("Purchase Option Provision"); *see also* Tr. at 55–56 (Mar. 19, 2002).

If RJE exercised this purchase option, the parties agree that the Option Agreement required RJE to assume all the extant environmental liabilities. *See* Def. Memo in Opp. to Prelim. Inj. at 7; Tr. at 55–56 (Mar. 19, 2002). The parties informed the Court that they came to this conclusion because the Option Agreement calls for Northville to list all environmental liabilities in a liability disclosure schedule, the contents of which RJE would be required to assume under the Purchase Option Provision. *See* Tr. at 54–55 (Mar. 19, 2002); *see also* Option Agreement §§ 1.01, 1.03(b)(ii), 4.08(d), Annex B. As Mark Shehan, one of RJE's attorneys in the 1988 negotiations, confirmed:

> Q: And RJE would therefore assume all of those [environmental] liabilities had it exercised its option [under the Purchase Option Provision]; isn't that correct, sir?
>
> A: Had it exercised its option.
>
> Q: And RJE would have had no cap on the environmental liabilities had it exercised that option, would it?
>
> A: That is correct.

9. This amount was arrived at by applying the Harold Bernstein family's 55.66% original ownership share to the $30 million ascribed to the value of the Pipeline System.

10. This amount was arrived at by applying the Raymond Bernstein family's 44.34% original ownership share to the $30 million ascribed to the value of the Pipeline System.

11. There is a clause in the Pipeline Option Termination Provision that appears to extend Northville's option under this provision indef-

Tr. at 55–56 (Mar. 19, 2002). The Purchase Option Provision is the only provision in any of the four agreements that made reference to the assumption of environmental liabilities by RJE in connection with any sale of the Pipeline System.

**Purchase Option Termination Provision:** This provision provided that Northville could buy out RJE's interest in the Pipeline System for $13.3 million,[10] subject to certain enumerated adjustments, during the first five years and at any time during the subsequent 180–day period (unless, of course, RJE had exercised its purchase option during that 180–day period).[11] *See* Option Agreement § 1.04 ("Pipeline Option Termination Provision"). The provision references the PPAA by providing that RJE may decide to accept less than the $13.3 million in lieu of payments RJE would otherwise be required to make to Northville under the PPAA. *See* Option Agreement § 1.04(ii); *see also* PPAA §§ 1, 2.

**Abandonment Provision:** This provision, which has triggered the litigation, governed the disposition of the Pipeline System should Northvile decide, as it now has, to "shut down or cease operating" the Pipeline System. It provides:

> In the event [Northville] determines to shut down or cease operating ... the Pipeline System ... [Northville] shall promptly notify RJE in writing and ...

initely if RJE exercised its purchase option but failed to close within the time specified in Section 1.02 of the Option Agreement. *See* Option Agreement § 1.04 ("... and if the Pipeline Option Closing has not occurred within the period specified in Section 1.02 hereof, [Northville may exercise the Purchase Option Termination] at any time after expiration of such period."). Whether the Court's reading of this provision is correct is not of particular significance since this option has not been exercised.

obtain ... an appraisal ... [by] an independent appraiser ... as to the fair market value of the Pipeline System. Following the receipt of such appraisal, RJE and [Northville] shall have the right to submit to each other, within 30 days of the receipt of the appraisal, a bid (the "RJE Bid" and the "[Northville] Bid", respectively) at which price it will purchase the Pipeline System or effect the Pipeline Option Termination,[12] respectively. If the RJE Bid is higher than the [Northville] Bid, RJE shall purchase the Pipeline System and, if the [Northville] Bid is higher than the RJE Bid, [Northville] shall effect the Pipeline Option Termination, each at the prices specified in their respective bids; provided, however, that if neither the RJE Bid or [sic] the [Northville] Bid is higher than the appraisal price of the Pipeline System, RJE and [Northville] shall not have the right to purchase the Pipeline System or effect the Pipeline Option Termination, respectively, but [Northville] shall use its best efforts for a period of one year to obtain a third-party buyer for the Pipeline System.

Option Agreement § 2.04 ("Abandonment Provision"). At the hearing, Mr. Shehan explained how the Abandonment Provision came to be included in the Option Agreement:

Q: Now, you mentioned before certain conversations you had with [Northville's attorney's] regarding the abandonment provision?

A: Yes, I did.

Q: Do you recall how the topic of the abandonment scenario first came up?

A: I brought it up in response to discovering that we would lose our consulting fee per the consulting agreement if Northville ceased to operate the Pipeline System and again wanted the ability to perhaps purchase that asset, and so it was brought up in a telephone call. In fact, I have to say, is a new point, this is what out client wants. . . .

Tr. at 41 (Mar. 19, 2002). There is no mention of environmental liabilities in the Abandonment Provision.

### D. Purchase Price Adjustment Agreement

Finally, the PPAA required RJE to pay 44.34% of designated Northville liabilities ("Covered Liabilities"), consistent with its responsibilities prior to the Stock Purchase Agreement, up to a defined cap. *See* PPAA §§ 1 & 2. The cap was set at "approximately the amount that [RJE] received [in consideration for its shares of Northville]," Tr. at 206 (Mar. 20, 2002) (Harold Bernstein Direct Testimony). The Covered Liabilities were broadly defined, and included:

any loss, liability, damage, fine, judgment, payment, claim, cause of action, amount paid, cost or expense ... (each, a "Loss") which has been paid or is due and payable by [Northville] ... arising out of, or otherwise in respect of any state of facts existing, or any act or omission occurring, on or before June 30, 1988, whether or not such Loss was known or unknown, contingent or liqui-

---

**12.** This reference to the Pipeline Option Termination was necessary because realistically Northville, as the current owner of the Pipeline System, could not "purchase the Pipeline System." If Northville prevails in the bidding process, it will pay RJE the 44.34% of the bid price, and all rights RJE has in the Pipeline System pursuant to the Option Agreement and the Consulting Agreement would terminate; obviously, the $13.3 million price set forth in the Pipeline Option Termination Provision is inapplicable in the abandonment scenario.

dated, choate or inchoate on such date . . .

PPAA § 1(a). The PPAA section defining the Covered Liabilities had a specific subsection devoted to existing and future remediation costs associated with the leaks, which included:

> any Loss or capital expenditure which has been paid or is due and payable by [Northville] in connection with the remediation of any environmental damage or contamination, (i) based upon, arising out of, or otherwise attributable or related to, the operation of the Business on or before June 30, 1988, or (ii) otherwise based upon, arising out of, or otherwise in respect of any state of facts existing, or any act or omission occurring, on or before June 30, 1988 . . . whether [known or unknown] . . . includ[ing], without limitation, any Loss or capital expenditure incurred or paid in connection with (A) the construction of a proposed gasoline and ground water treatment system in Setauket, New York, (B) the operation of such plant and similar plant at Holtsville, New York, (C) the testing of the Pipeline System and any surrounding real property or to determine and monitor the existence and extent of (1) any damage or defect to the Pipeline System, and (2) any such environmental damage or contamination. . . . (D) the development and operation of community programs related to the remediation of any Environmental Damage, and (E) any internal legal, administrative or operational expense of the Company or any of its subsidiaries related to the remediation of any Environmental Damage . . .

PPAA § 1(e).[13]

The Stock Purchase Agreement, the Option Agreement and the PPAA all contained provisions that explicitly incorporated the terms of all four agreements. *See* Stock Purchase Agreement § 7.06; Option Agreement § 7.04; PPAA § 10; *see also* Stock Purchase Agreement, Art. II ("Related Agreement") (listing PPAA, Consulting Agreement and Option Agreement).

## IV. Events Subsequent to Execution of Agreements

Between September 1988 and July 2001 the parties operated under these agreements without any relevant disputes, and neither party chose to exercise any of its options under the Option Agreement. RJE received its annual $840,000 consulting fee, which payments now total approximately $11 million. Northville continued to operate the Pipeline System until 1992, when it was leased to a third party. *See* Tr. at 299–300 (Mar. 20, 2002). Over the

---

**13.** Other liabilities explicitly contained within the definition of the Covered Liabilities included: payments made pursuant to a debt to the John Hancock Mutual Life Insurance Company, *see* PPAA § 1(b); losses attributable to indemnification claims, *see* PPAA § 1(c); the cost of implementing environmental safety provisions mandated by law, *see* PPAA § 1(d); any costs associated with recovering insurance reimbursements for any of the Covered Liabilities, *see* PPAA § 1(f); any costs associated with shutting down any portion of the Northville business where Northville determines that the company would be better served by closure than by compliance with the environmental safety provisions mandated by law, *see* PPAA § 1(g); any expenditures associated with the purchase of real property for the purpose of mitigating any of the Covered Liabilities, *see* PPAA § 1(h); any payments associated with the purchase of expropriation insurance for Northville's Panamanian operation, *see* PPAA § 1(i); any expenditures made in an effort to prevent or delay the implementation of the environmental safety provisions mandated by law, *see* PPAA § 1(j); any expenditures associated with upgrading portions of the Pipeline System, *see* PPAA § 1(k); certain specified tax liabilities, *see* PPAA § 1(*l*); and certain specified legal fees, *see* PPAA § 1(m).

past nine years, Northville has received approximately $5 million per year on that lease. *See* Complaint Ex. 8 at p. 11 (providing documentary evidence). At all times, however, Northville retained responsibility under the lease for the remediation of the Holtsville and Setauket leaks.

In compliance with the Covered Liabilities provisions of the PPAA, RJE paid its proportionate share of the environmental liabilities through February 14, 1995. According to RJE, its payments under the PPAA totaled "over $30 million subsequent to being bought out of Northville." Tr. at 18 (Mar. 19, 2002) (Shehan Direct Testimony).[14] On February 14, 1995, the parties agreed that RJE no longer had to use its own monies to pay for the Covered Liabilities. *See* Complaint Ex. 4 ("Amendatory Agreement"); *see also* Tr. at 23, 40 (Mar. 19, 2002) ("COURT: [Y]ou agree that RJE has discharged its obligations under the PPAA[?] [DEFENDANT'S COUNSEL]: Your honor, subject to the other provisions of that agreement, you are correct.").[15] Since February 14, 1995, Northville has borne sole responsibility for the remediation costs. It estimates that it has paid approximately $100 million for such costs from its own resources since discovery of the leaks, *see* Tr. at 159 (Mar. 19, 2002) (Ripp Direct Testimony), and has appraised the cost of future remediation to be $26.7 million. *See* McConaghy Aff. Ex. S (McConaghy Ltr. Feb. 22, 2002); *see*

*also* McConaghy Aff. Ex. M ("Evaluation of Future Environmental Liabilities"). According to Northville, after many difficult years, the Pipeline System is now "finally maybe at a point in time where it could be profitable." Tr. at 173 (Mar. 19, 2002).

## V. The Dispute

Notwithstanding this prospect of profitability, in July 2001 Northville provided RJE with notice of its intent to "abandon" the Pipeline System, thereby triggering the Abandonment Provision. *See* McConaghy Aff. Ex. D (Ripp Ltr. Jul. 27, 2001). Pursuant to the Abandonment Provision, an independent appraiser conducted an appraisal of the "fair market value of the Pipeline System." Option Agreement § 2.03. On February 13, 2002, the appraiser assessed the "market value" of the system's assets, excluding Northville's appraisal of the future remediation costs, to be $40.5 million.[16] Complaint Ex. 8 at 19 ("Long Island Pipeline/Terminal Examination"). The parties then had until March 15, 2002 to submit bids which, under the Abandonment Provision, had to be "higher than the appraisal price[.]" Option Agreement § 2.03.

On February 22, 2002, Northville sent a letter to RJE, stating:

**14.** Northville estimates that of this sum $21 million to $25 million was for environmental liabilities. *See* Tr. at 159 (Mar. 19, 2002) (Ripp Direct Testimony).

**15.** The cap for Covered Liabilities contemplated the possibility that additional monies could become available from certain third-party sources, which would be applied to the Covered Liabilities. *See* PPAA § 2(c).

**16.** The parties agreed to modify the system for appraisal set forth in the Abandonment Provision. Instead of securing a single inde-

pendent appraiser, as provided for under the Abandonment Provision, the parties agreed to each obtain separate appraisals and, assuming the appraisals were within 10% of each other, the average of the two prices would be the appraised price under the Abandonment Provision. The two appraisals were, however, not within the specified range; therefore, the parties did eventually seek a single independent appraisal. Pursuant to the parties' modification of the appraisal process, that appraisal was required to fall between the RJE and Northville appraisals.

[T]he fair market value of the Pipeline System for purposes of Section 2.03 of the Option Agreement . . . as of September 30, 2001, is $40.5 million less [$26.7 million, the outstanding environmental liabilities], or [$13.8 million]. It is based upon this fair market value [$13.8 million] that the bidding process is to proceed. As you know, the assumption of environmental liabilities is, and always has been, an essential part of this process, and Northville is a seller of the Pipeline System to RJE only on an "as is" basis.

McConaghy Aff. Ex. S.

On February 26, 2002, RJE responded, stating:

[O]nce the Abandonment Provision is invoked by Northville, which vests RJE with the right to participate in the bidding process set forth therein and, if RJE is the successful bidder, to purchase the Pipeline System, as defined in the Option Agreement[, t]he Option Agreement makes crystal clear that the sale mandated under Section 2.03 is an asset sale, not one that includes the environmental liabilities, for which Northville remains solely responsible.

McConaghy Aff. Ex. T (Shehan Ltr. Feb. 26, 2001).

RJE maintains that it is unable to calculate its bid because of the uncertainty regarding the proper appraisal price. It has brought this litigation for a judicial declaration of the meaning of the "fair market value of the Pipeline System" in the Abandonment Provision in order to enable it to proceed with the bidding process.

## VI. Parties' Contentions and Explanatory Extrinsic Evidence

### A. RJE's Contentions

RJE claims that the "fair market value of the Pipeline System" in the Abandonment Provision unambiguously requires a straight asset sale because the Pipeline System is defined in the preamble of the Option Agreement to include only assets, without any reference to liabilities. RJE further argues that if these provisions of the Option Agreement leave any doubt that the Abandonment Provision calls for a straight asset sale, all doubt is removed when the Abandonment Provision and the preamble of the Option Agreement are read in conjunction with the cap set forth in the PPAA. In that regard, RJE argues that under no circumstance can Northville compel RJE to assume responsibility for any environmental liability (or other Covered Liabilities) in excess of that cap. Finally, RJE points out that since the Abandonment Provision pertains to Northville's decision to "shut down or cease operating" the Pipeline System, the sale of the assets under the Abandonment Provision is analogous to a going-out-of business or liquidation sale, which is simply a straight asset sale.

In the alternative, RJE argues that even if the Court views the agreements as ambiguous, the extrinsic evidence adduced at the hearing and in the parties' submissions confirms that the parties intended a straight asset sale. RJE claims that after learning of the leaks it was willing to sell its shares of Northville only if it could limit its exposure to the environmental liabilities. In support of this contention, Mr. Shehan explained: "The one leading concept that was sacrosanct in this transaction . . . was [that] there would be a maximum limit on liability that the Raymond Bernstein family would assume." Tr. at 84 (Mar. 19, 2002). Several of Northville's witnesses testified about the parties' understanding in that regard. For example, Harold Bernstein stated:

Raymond was concerned with the cost [of the environmental liabilities] and that

he would have to take money out of his pocket to continue to pay for his 45%. *What I agreed to do was my family through Northville would fund the amount necessary above a certain number* that we would establish based on what Raymond received, I think, at the original transaction . . . .

Tr. at 205 (Mar. 20, 2002) (emphasis added). Jay Bernstein, Harold's son and Chairman and CEO of Northville, stated:

Consistently throughout the negotiations, dating back I think as far as '86 or '87, Raymond had sought and *we agreed he shouldn't be obligated to fund any more of his liabilities than what he derived from the deal.*

Tr. at 295 (Mar. 20, 2002) (emphasis added). Peter Ripp, Northville's Senior Vice President of Finance and Administration, also confirmed RJE's position regarding the cap:

Well, there might be a liability of $100 million. *One of the tenets of the deal was that [RJE] shouldn't have to pay any more for the liability than they got out of the company.* If they only got out of the cap $55 million, they would ask to pay out $55 million but not $56 million.

Tr. at 121 (Mar. 19, 2002)(emphasis added). The cap, as described by Barnet Phillips, one of RJE's negotiators, was "a pill that they—Harold Bernstein's family had swallowed but it was a bitter one." Phillip's Aff. at 284. (Feb. 25, 1993).

RJE contends that in return for this cap the Raymond Bernstein family gave up valuable consideration, including their voice in the management of Northville, substantial future stock dividends, and positions of employment at Northville which carried with them large annual salaries and bonuses. The cap would be meaningless, according to RJE, if it could be obviated at any time at Northville's option

under the Abandonment Provision. *See* Tr. at 15–16 (Mar. 19, 2002); Tr. at 232 (Mar. 20, 2002).

RJE's contention that the sale under the Abandonment Provision was akin to a going-out-of-business or liquidation sale finds some support in the following testimony of Harold Bernstein:

So, it might come to a point where you couldn't continue having permits or remediation and the lawsuits were so excessive you would say I'm going to close down and I'm just going to *sell off the land and whatever assets are there.*

Tr. at 212 (Mar. 20, 2002) (emphasis added).

In sum, RJE contends that the deal struck in 1988 was that Northville agreed to limit RJE's potential downside in the Pipeline System under the cap in the PPAA and, in return, RJE agreed to limit its upside to fixed compensation under the Consulting Agreement.

### B. *Northville's Contentions*

Northville also claims that the meaning of "fair market value of the Pipeline System" is unambiguous, but that it unambiguously means that the value to be ascribed to the sale of the Pipeline System must account for future remediation costs for the remaining environmental liabilities; therefore it is the net value of the assets. Northville supports its position with a number of arguments. It relies on a New York Court of Appeals case, *Commerce Holding Corp. v. Board of Assessors*, 88 N.Y.2d 724, 649 N.Y.S.2d 932, 673 N.E.2d 127 (1996), and similar cases, which it claims require the inclusion of environmental liabilities in the assessment of the fair market value of property. It argues, moreover, that the environmental liabilities will, as a matter of law, transfer to the owner of the Pipeline System; therefore, it

would be highly anomalous not to account for those liabilities in the purchase price:

> The environmental costs that are at issue here are not fixed liabilities but ongoing clean-up costs that any owner of the Pipeline System would be required to bear in order to obtain a permit to operate the system (and, indeed even if it did not intend to operate the system). *See* N.Y. Navigation Law § 174(3) (implementation of petroleum clean-up is a "condition precedent" to issuance or renewal of license to operate petroleum storage of pipeline facilities); §§ 181(1) & (3) (imposing strict liability for clean-up costs on owners and operators). These are costs that are imposed by operation of law

Def. Post–Hr'g Memo. at 15.

Regarding the listing of the assets comprising the Pipeline System in Annex A, as incorporated in the preamble of the Option Agreement, it does not, according to Northville, evidence the parties' intention to effect an asset sale; rather, it is merely a description of the "metes and boundaries" of the property to be sold, as would appear "in the context of any property sale." Tr. at 5 (Mar. 21, 2002) (Northville's Closing Argument).

In regard to the PPAA, Northville contends that, as the name suggests (Purchase Price Adjustment Agreement), it was simply a mechanism for adjusting the purchase price of the Stock Purchase Agreement; therefore, the cap in the PPAA has no application under the Abandonment Provision. *See* Tr. at 296 (Mar. 20, 2002) (Jay Bernstein Direct Testimony) ("I don't think the pipeline system has anything to do with the cap."). Northville also relies on the language of the Purchase Option Provision providing that RJE would assume all the environmental liabilities under that provision. It argues:

> Indeed, it would make no sense whatsoever for the parties to have agreed that RJE would have to assume liabilities and debt if it purchased the Pipeline System under the purchase option, but RJE would not have to assume them if it purchased it under the Abandonment Provision.

Def. Memo in Opp. to Prelim. Inj. at p. 7. Northville makes a similar argument with respect to the Right of First Refusal Provision insofar as RJE would also be required to assume future remediation costs if it decided to match the terms of a third-party purchaser who agreed to such assumption. In addition, Northvile contends that under the Sale Provision, RJE would effectively be required to assume a share of future remediation costs if a third-party purchaser agreed to assume those costs, thereby requiring a reduction in the monies RJE would realize from the sale. In sum, Northville argues that if the PPAA truly capped RJE's liability, "[all of] these provisions requiring RJE to assume liability would be meaningless." Def. Memo in Opp. to Prelim. Inj. at 9.

In the alternative, Northville also relies on extrinsic evidence. It points to the proposal to spin-off the Pipeline System into a separate corporation as evidence of the parties' intention simply to forestall distribution of the assets and liabilities associated with the Pipeline System. Specifically, it claims in that regard that since the new corporation would have been jointly owned by the parties in proportion to their Northville stock holdings, neither party would have had to shoulder a disproportionate share of the remediation costs. Northville argues that since this arrangement was acceptable to both parties before they were advised about the risks of personal liability, it is evidence that the parties intended the "fair market value of the Pipeline System" to account for remedia-

tion costs associated with the environmental liabilities.

As further extrinsic evidence, Northville points to the economics of the transaction, contending that the Harold Bernstein family would never have agreed to "accept more than their *pro rata* share of the liability." Tr. at 146 (Mar. 19, 2002) (Ripp Direct Testimony). Specifically, Northville argues that the amount of environmental liabilities that RJE has paid under the PPAA is significantly less than 44.34% of the total liabilities (the amount that the Raymond Bernstein family would have been responsible for had it not sold its shares of Northville), and to interpret the Abandonment Provision to allow RJE to escape responsibility for the remaining liabilities would amount to an unintended windfall. *See* Tr. at 296–7 (Mar. 20, 2002).

## DISCUSSION

■ Federal courts have jurisdiction over declaratory judgment actions only in "a case of actual controversy." 28 U.S.C. § 2201. To qualify, a controversy must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co., v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *see also Amica Mut. Ins. Co. v. Franklin,* 147 F.3d 238, 243 (2d Cir.1998) (issuing declaratory judgment on proper interpretation of a contract); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* 145 F.3d 481, 486 (2d Cir.1998) (same). The uncertainty regarding the proper appraisal price and the deadline for bids render this controversy of "sufficient immediacy" to warrant a declaratory judgment.

■ Since this action is brought pursuant to the Court's diversity jurisdiction, New York substantive law applies. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The Option Agreement contains a choice of law provision that provides that it is to be "construed and enforced in accordance with the laws of the State of New York." Option Agreement § 7.08. Under New York law, contractual choice of law provisions are valid so long as the transaction bears a reasonable relationship to New York. *See* N.Y. U.C.C. § 1–105 (McKinney 1993); *Marine Midland Bank, N.A. v. United Missouri Bank, N.A.,* 223 A.D.2d 119, 643 N.Y.S.2d 528, 530 (1st Dep't 1996) (citing *Wyatt v. Fulrath,* 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965) ("As a general rule, choice of law provisions ... are valid and enforceable in [New York].")). Since the transaction in this litigation relates to the Pipeline System on Long Island, New York, New York law governs.

■ "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir.2000) (citing *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)); *see also Hartford Acc. & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). "[W]hen the intent of the parties can fairly be gleaned from the face of the instrument," the plain words of the contract govern, and "matters extrinsic to the agreement may not be considered." *Terwilliger,* 206 F.3d at 245; *see also W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). Contract provisions should not be read in isolation; rather, "the entire contract must be considered, and all parts of it reconciled." *Terwilliger,* 206 F.3d at 245; *see Laba v. Carey,* 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971) (holding that provisions within a

contract "must be read together ... [and the] intent must be gleaned from the several provisions of the contract."); *see also Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir.1994) (applying federal common law) ("[D]efendant's attempt to read [contract provisions] in isolation is, however, inconsistent with well established principles of contract construction, which require that all provisions of a contract be read together as a harmonious whole, if possible."); 22 N.Y. Jur.2d Contracts § 251 ("Because the intention of parties to a contract is ascertained, not from one provision or particular words or phrases, but from the entire instrument, in the construction of contracts, the entire contract must be considered."). "[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *Readco Inc. v. Marine Midland Bank,* 81 F.3d 295, 300 (2d Cir.1996) (citing *Hudson–Port Ewen Assocs., L.P. v. Chien Kuo,* 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991)). Not only must provisions within an individual contract be read together, but also "[w]here several instruments constitute part of the same transaction, they must [also] be interpreted together." 22 N.Y. Jur.2d Contracts § 258; *see also Nau v. Vulcan Rail & Construction Co.,* 286 N.Y. 188, 197, 36 N.E.2d 106 (1941) (holding that several agreements "must be read together as one ... [when] they were to effectuate the same purpose and formed a part of the same transaction."); Restatement (Second) of Contracts § 202(2) ("[A]ll writings that are part of the same transaction are interpreted together.").

 When contract language is ambiguous, extrinsic evidence is relevant to the extent it bears on "the parties' objective manifestations of intent." *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 302

(S.D.N.Y.1997) (applying New York law); *see also Wells v. Shearson Lehman/American Exp.,* 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988). *But see Walk–In Med. Ctr., Inc. v. Breuer Capital Corp.,* 818 F.2d 260 (2d Cir.1987) ("Evidence of the parties' subjective intent was ... properly admitted" in order to interpret ambiguous language.). "A contract is ambiguous if it is reasonably susceptible of more than one interpretation." *Nycal,* 988 F.Supp. at 299 (quoting *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990)). When interpreting an ambiguous contract, the subsequent conduct of the parties also is relevant with regard to the parties' intention. *See Matter of Robinson v. Robinson,* 81 A.D.2d 1028, 440 N.Y.S.2d 127, 129 (4th Dep't 1981) (citing *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956)).

## I. The Agreements Read Together Unambiguously Provide for the Exclusion of Remediation Costs in Calculating the "Fair Market Value of the Pipeline System"

 The Court concludes that the parties unambiguously intended a straight asset sale, meaning that the fair market value of the Pipeline System shall not take into account the appraised costs of future remediation. The Court comes to this conclusion for the following combined reasons: (A) the use of the defined term "Pipeline System" in the "fair market value" clause of the Abandonment Provision suggests a straight asset sale; (B) the PPAA explicitly capped RJE's responsibility for remediation costs; (C) none of the provisions in any of the agreements allows Northville to impose, by exercise of any of its options, remediation costs on RJE in excess of the PPAA cap, and (D) where the parties intended to have RJE assume environmental

liabilities, they explicitly provided for such assumption.

### A

The parties certainly could have specifically addressed whether or not the appraisal of the "fair market value of the Pipeline System" in the Abandonment Provision should account for future remediation costs associated with existing environmental liabilities. *See, e.g., Buffalo Color Corp. v. Alliedsignal, Inc.*, 139 F.Supp.2d 409 (W.D.N.Y.2001) (applying New York law) (holding that contract specifically provided that seller would retain environmental liability); *Paramount Communications Inc., v. Horsehead Indus., Inc.*, 231 A.D.2d 40, 660 N.Y.S.2d 718 (1st Dep't 1997) (holding that contract provided that purchaser would assume environmental liabilities). Despite their failure to do so, the use of the defined term "Pipeline System" in the "fair market value" clause of the Abandonment Provision would appear to support RJE's contention that the drafters intended a straight asset sale because "Pipeline System" is defined as a list of discrete assets, without any mention of environmental liabilities.[17] The Court has some pause only because when the Abandonment Provision speaks in terms of ceasing to operate and shutting down the "Pipeline System," the term "Pipeline System" is there used in the context of terminating a business rather than the sale and purchase of specific assets. Even in that context, the termination of a business invariably would entail the disposition of its assets, similar, as RJE correctly argues, to a liquidation or going out of business sale. In hindsight, any arguable confusion could have been eliminated if the parties had specifically provided: "In the event Northville determines to cease operating the

pipeline business, the parties' bids will be based on the value of the pipeline assets, itemized in Annex A hereto, unencumbered by any existing liabilities."

Regardless, one thing is certain: the language of the Abandonment Provision does not, as Northville argues, unambiguously require that the value of the assets be offset by the costs of future remediation in calculating the appraisal price. Northville's reliance on *Commerce Holding Corp. v. Board of Assessors*, 88 N.Y.2d 724, 649 N.Y.S.2d 932, 673 N.E.2d 127 (1996), and similar cases, holding that the fair market value of property in the context of tax valuation or condemnation proceedings must account for the environmental liabilities associated with the property, is misplaced. In *Commerce Holding*, the court rested its opinion explicitly on a New York State constitutional provision that property tax assessments "shall in no case exceed full value." *Id.* at 729, 649 N.Y.S.2d 932, 673 N.E.2d 127 (quoting N.Y. Const., Art. XVI, § 2). In the tax context, it would be inequitable to tax a land owner at a rate that does not account for the real value of his or her property, including environmental liabilities. Likewise, in the condemnation context, it would be illogical not to account for liabilities from which a landowner will be relieved by virtue of the condemnation. In other contexts, however, New York courts have held that "fair market value, being a question of fact, will depend upon the circumstances of each case; there is no single formula for mechanical application." *Matter of Seagroatt Floral Co.*, 78 N.Y.2d 439, 444, 576 N.Y.S.2d 831, 583 N.E.2d 287 (1991) (interpreting "fair market value" in context of New York Business Corporation Law); *see also Matter of Burnham*, 261 A.D.2d 863, 689 N.Y.S.2d 792, 793 (4th Dep't 1999)

---

**17.** It is clear that the parties intended to incorporate the definition of the "Pipeline Sys-

tem" in the preamble because they capitalized the term, as they did with all defined terms.

(same). In the context of a private contract, there is no inequity in excluding environmental liabilities from the valuation of property if the parties intended a straight asset sale. Therefore, the case law relied upon by Northville does not clarify the meaning of "fair market value."

■■■■ Moreover, Northville's contention that the owner of the Pipeline System will be responsible for the environmental liabilities as a matter of law, is not evidence of the parties' intent. While a party may not escape liability to the government under the environmental laws, "it may arrange contractually for someone else to actually bear the expense of those obligations that are imposed upon it." *Horsehead Indus.*, 660 N.Y.S.2d at 723. Assuming RJE would be strictly liable for remediation costs if it were to acquire the Pipeline System, it would not necessarily be left without recourse against Northville, even if the issue be not contractually addressed, because, as a matter of law, a purchaser of property with environmental contamination may seek contribution for remediation costs from the seller. *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir.2000); *Town of Oyster Bay v. Occidental Chemical Corp.*, 987 F.Supp. 182, 207 (E.D.N.Y.1997).

Even if the Court were to conclude that the meaning of "fair market value of the Pipeline System" within the confines of the Abandonment Provision unambiguously supported Northville's interpretation, this would not be the end of the inquiry. This is so because regardless of whether the fair market value clause is ambiguous or unequivocal, the Court must read the clause in the context of all relevant provisions of all of the agreements since they are part of a single negotiated transaction. *See* Stock Purchase Agreement § 7.06 (incorporating the terms of the other agreements); Option Agreement § 7.04 (same); PPAA § 10 (same); *see also* Stock Purchase Agreement, Art. II ("Related Agreement") (listing PPAA, Consulting Agreement and Option Agreement); *see also Laba*, 29 N.Y.2d at 307, 327 N.Y.S.2d 613, 277 N.E.2d 641; *Nau*, 286 N.Y. at 197, 36 N.E.2d 106. For example, in *Laba* the Court of Appeals held that a provision in a contract for the sale of real property which created a condition precedent that the purchaser be able to acquire title insurance, read in isolation, would only be satisfied if the title company agreed to insure the property "unconditionally and without exception." 29 N.Y.2d at 307, 327 N.Y.S.2d 613, 277 N.E.2d 641. Nevertheless, the court concluded that when read together with a separate provision, stating that the seller took the property subject to easements, the title insurance provision did not mean that the insurance must be unconditional. *See id.* at 308–09, 327 N.Y.S.2d 613, 277 N.E.2d 641.

**B**

The plain language of the PPAA reinforces that the parties intended a straight asset sale in the abandonment scenario. The entire purpose of the PPAA, apparent on the face of the agreement, was to allocate some responsibility to RJE for the Covered Liabilities and to limit that liability to a specified cap. The environmental liabilities are explicitly listed and painstakingly detailed as Covered Liabilities in the PPAA. *See* PPAA § 1(e). The cap in the PPAA would be illusory if Northville could obviate the limit at any time by invoking the Abandonment Provision. That the parties so clearly and specifically capped RJE's responsibility for the environmental liabilities in the PPAA informs that they did not intend to permit Northville to impose an obligation in excess of that cap on RJE through the broad and general language of the Abandonment Provision. *See*

*generally Montgomery–Otsego–Schoharie Solid Waste Mgmt. Auth. v. County of Otsego,* 249 A.D.2d 702, 671 N.Y.S.2d 545, 547 (3d Dep't 1998) ("[W]hen a general contract provision is in conflict with a specific one ·the latter will generally be enforced.").

Northville's contention that the PPAA was only intended to adjust the purchase price of the Stock Purchase Agreement and not to cap RJE's responsibility for environmental liabilities is incorrect. There is an entire subsection in the PPAA devoted to environmental liabilities associated with the Pipeline System. *See* PPAA § 1(e) ("remediation of any environmental damage or contamination ... based upon, arising out of, or otherwise attributable or related to ... the Pipeline System"). The Option Agreement makes explicit reference to the PPAA, *see* Option Agreement § 1.04, and, as the Court has concluded, these agreements must be read together.

**C**

There is no provision in any of the agreements that empowers Northville to compel RJE to assume responsibility for environmental liabilities in excess of the PPAA cap. This is a strong indication that the parties did not intend such a result under the Abandonment Provision. Northville's claim that it would make "no sense whatsoever" for the parties to have required RJE to assume environmental liabilities under the Purchase Option Provision, the Sale Provision, and possibly under the Right of First Refusal Provision,[18] but not under the Abandonment Provision, is logically flawed. Def. Memo in Opp. to Prelim. Inj. at p. 7.

First, with respect to the Sale Provision, contrary to Northville's contention, RJE could not be required to assume remediation costs in excess of the cap, either directly or indirectly. If a third-party purchaser agreed to assume the remediation costs, RJE would receive 44.34% of the "sale proceeds" and 44.34% of "other consideration," which would include the benefit Northville received by being relieved of the remediation costs. Option Agreement § 2.02; *see, e.g., Holt v. Feigenbaum,* 52 N.Y.2d 291, 300, 437 N.Y.S.2d 654, 419 N.E.2d 332 (1981) ("Consideration for defendant's promise may also be found in plaintiffs' separate promises to the bank to assume personal liability"); *Walcutt v. Clevite Corp.,* 13 N.Y.2d 48, 53, 241 N.Y.S.2d 834, 191 N.E.2d 894 (1963) ("The consideration was to be paid by the new corporation part in cash and part by the assumption of certain liabilities"). For example, if a third party today agreed to purchase the Pipeline System for $1 and assume $100 million of liabilities for remediation costs (costs for which Northville would have been solely responsible but for the sale), RJE would receive $44,340,000.44, not 44¢ as Northville's patently unreasonable contention would dictate. *See* Restatement (Second) of Contracts § 203 ("[A]n interpretation which gives a reasonable ... meaning to all the terms is preferred to an interpretation which leaves a part unreasonable."); 22 N.Y.Jur.2d Contracts § 222 ("The court must endeavor to give contracts a fair and reasonable interpretation."). Plainly, the Sale Provision is not a mechanism by which Northville could compel RJE to assume remediation costs in excess of the cap.

---

**18.** Since under the Right of First Refusal Provision Northville was required to accept the same terms offered by a potential third-party purchaser, RJE could be required under this provision to assume the environmental liabilities if the third-party purchaser agreed to such assumption and RJE elected to invoke the provision.

With respect to the Purchase Option and Right of First Refusal Provisions, there is a critical distinction between these provisions, on the one hand, and the Abandonment Provision, on the other. The former can only be invoked by RJE; the latter can only be invoked by Northville. Thus, the distinction that Northville claims would "make no sense whatsoever," is wholly consistent with RJE's assertion that it bargained for a cap on liabilities and that Northville could not compel RJE to assume any liabilities in excess of that cap.

### D

When the drafters of the agreements intended to require the assumption of environmental liabilities they did so explicitly, not by implication. Under the Purchase Option Provision, the parties stated in plain language that RJE was to assume all remaining environmental liabilities. Likewise, in the PPAA, the parties explicitly defined the scope of the liabilities that RJE would assume. By contrast, there is no language in the Abandonment Provision requiring RJE to assume any liabilities.

In sum, the Court concludes that when the agreements are read together they unambiguously require that the bids under the Abandonment Provision are to be based on the fair market value of the assets set forth in the Pipeline System definition without consideration for future remediation costs associated with existing environmental liabilities.

### II Even if the Agreements Were Deemed Ambiguous, Extrinsic Evidence Resolves the Dispute in Favor of RJE

Even if the meaning of "fair market value of the Pipeline System" be deemed ambiguous, extrinsic evidence establishes that the bids are to proceed on the basis of a straight asset sale. The Court reaches this conclusion for four reasons. First, throughout the hearing, Northville's witnesses repeatedly testified that the purpose of the cap in the PPAA was to limit RJE's exposure for the environmental liabilities—a purpose that would be completely frustrated by Northville's reading of the Abandonment Provision. Second, the history of the negotiations in general, and the Abandonment Provision in particular, also confirms that RJE consistently insisted on capping its liability as a condition for selling its shares, and the Abandonment Provision was not intended as an exception to that cap. Third, the subsequent conduct of Northville in assuming responsibility for remediation costs, without any attempt to seek contribution from RJE over the cap, makes perfectly clear that future remediation costs are Northville's sole responsibility. Finally, Northville's argument that its interpretation is required to avoid granting RJE a windfall, is nothing more than a hindsight determination that Northville is now unhappy with the deal it struck in 1988.

### A. Purpose of the PPAA Cap

The evidence adduced at the hearing revealed that both parties understood the cap in the PPAA to be the realization of Raymond Bernstein's desire to limit his exposure for environmental liabilities. Harold Bernstein admitted this when he stated: "What I agreed to do was my family through Northville would fund the amount necessary above a certain number." Tr. at 205 (Mar. 20, 2002). Jay Bernstein confirmed this understanding: "[W]e agreed [Raymond] shouldn't be obligated to fund any more of his liabilities than he derived from the deal." Tr. at 295 (Mar. 20, 2002). That the cap in the PPAA was the most heavily negotiated point in the agreements, and was described as a bitter pill swallowed by the

Harold Bernstein family, belie Northville's contention that the parties intended the cap to be penetrable at any time at Northville's option under the Abandonment Provision. *See* Tr. at 15–16 (Mar. 19, 2002); Tr. at 232 (Mar. 20, 2002); Phillip's Aff. at 284. (Feb. 25, 1993); *see generally Reda v. Eastman Kodak Co.,* 233 A.D.2d 914, 649 N.Y.S.2d 555, 557 (1996) ("[A] contract must be interpreted so as to give effect to, not nullify, its general or primary purpose.").

### B. Course of Negotiations

Throughout the negotiations, every plan that was deemed acceptable to the parties involved a cap on the liabilities that would be assumed by the Raymond Bernstein family. Even the contemplated spin-off plan would have limited the Raymond Bernstein family's environmental liabilities because the Pipeline System would have thereby become the sole asset of the new corporation and, barring the piercing of the corporate veil, the Raymond Bernstein family's proceeds from the stock purchase could not have been reached to discharge the new corporation's environmental liabilities. It was only when the parties were advised that this plan might allow the corporate veil to be pierced, thereby exposing the family members to personal liability for the remediation costs, that the plan was abandoned. It is difficult to imagine that after Raymond Bernstein "[consistently] throughout the negotiations, dating back ... as far as '86 or '87 ... sought [a cap on liability]" he then, at the last moment, agreed to expose his family to unlimited liability under the Abandonment Provision. Tr. at 295 (Mar. 20, 2002) (Jay Bernstein testimony).

The genesis of the Abandonment Provision reinforces this conclusion. As Mr. Shehan testified: "I brought [ ] up [the abandonment scenario] in response to dis-

covering that we would lose our consulting fee per the consulting agreement if Northville ceased to operate the Pipeline System and again wanted the ability to perhaps purchase that asset." Tr. at 41 (Mar. 19, 2002). Thus, the underlying purpose of the Abandonment Provision was to protect RJE in the event of a shutdown, not to allow Northville to shift responsibility for the environmental liabilities.

### C. Subsequent Conduct

Since 1995, when RJE completed its obligations under the PPAA, Northville has borne sole responsibility for the environmental liabilities. It has expended millions of dollars on remediation during that period. Northville is not seeking, nor has it ever sought, any contribution for these remediation costs from RJE. Had it not invoked the Abandonment Provision, it would undoubtedly have continued to pay all remediation costs. Northville's conduct is an implicit recognition that it was, and is, solely responsible for the environmental liabilities in excess of the cap. It is difficult to imagine RJE agreeing to a scheme under the Abandonment Provision where Northville could, at its own election, shift those liabilities to RJE at any given time.

### D. Economic Analysis

The economics of the deal reinforce that the environmental liabilities must remain with Northville. If Northville's position is accepted, Northville could have deprived RJE of any benefit from the cap by invoking the Abandonment Provision as early as 1995, when RJE reached the cap. At that point, RJE would have been required, according to Northville, to accept its *pro rata* share of all future remediation costs for existing environmental conditions, notwithstanding the fact that it had just reached its bargained-for cap—thereby depriving

RJE of any benefit from the cap on environmental liabilities.

Northville's argument that RJE is receiving a windfall by escaping its share of liability above the cap is not without some intuitive appeal. Looking back on the deal from where the parties stand in the year 2002, it does appear that Northville has shouldered more than its share of remediation costs; however, this was not at all a foregone conclusion when the parties struck the deal in 1988. It was unclear in 1988 whether the environmental liabilities would be more or less than the PPAA cap. *See* Tr. at 51 (Mar. 19, 2002). As Mr. Shehan explained, "there was a fairly good belief that the covered liabilities would be taken care of in three or four years." Tr. at 31 (Mar. 19, 2002). This belief turned out to be incorrect because today, some fourteen years later, a portion of the environmental liabilities remains. If, however, the environmental liabilities had been dispensed in less than five years and the total fell under the cap, Northville would not have had to shoulder a disproportionate share, and could have then bought out RJE under the Pipeline Option Termination Provision for $13.3 million. If those circumstances had come to pass, then the deal would, in hindsight, look like a windfall for Northville.

Ultimately, who in hindsight got the better end of the deal is irrelevant. Northville agreed to cap RJE's liability in return for substantial consideration. Northville's present dissatisfaction with the results of the deal it struck in 1988 does not entitle it to rewrite the agreements. *See Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987) ("Generally, once a party to a contract has made a promise, the party must perform ... even when unforeseen circumstances make performance burdensome.").

The Court also questions why now, when the Pipeline System is "finally maybe at a point in time where it could be profitable," Tr. at 173 (Mar. 19, 2002), Northville has elected to "shut down or cease operating" the Pipeline System. It may well be that Northville wishes to relieve itself of its ongoing obligation under the Consulting Agreement to make yearly payments to RJE; the Abandonment Provision is the only remaining mechanism by which Northville can relieve itself of this unyielding financial burden, while retaining ownership of the pipeline assets. If Northville's effort to include the environmental liabilities in the price were successful, it would either: (1) be able to terminate its obligations under the Consulting Agreement at an artificially reduced price, assuming it would be the winning bidder, or (2) be able to compel RJE to assume the environmental liabilities, for which RJE otherwise would have no responsibility, assuming RJE would be the winning bidder. Under either scenario, it is Northville that would receive the windfall.

## III. Specific Performance is Not Warranted

Northville has stated that it only intends to go through with the bidding process under its theory of an "as is" sale. *See* McConaghy Aff. Ex. S. RJE correctly contends that once the Abandonment Provision is invoked, both parties are obligated to abide by the bidding process; accordingly, RJE seeks an order directing Northville to continue with the bidding procedures set forth in the Abandonment Provision.[19]

---

19. Northville contends that "RJE's request for specific performance of the bidding process is not before the Court for decision at this

time." Def. Post–Hr'g Memo. at 28 n. 9. Northville is incorrect. The parties argued the appropriateness of specific performance

▓▓▓ Under New York law, a plaintiff seeking specific performance must make an initial showing that "(1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law." *U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F.Supp.2d 915, 921 (E.D.N.Y.1999); *see also Hadcock Motors, Inc. v. Metzger*, 92 A.D.2d 1, 459 N.Y.S.2d 634, 636–37 (4th Dep't 1983). Once that showing is made, "[a] party seeking [specific performance] must show equitable factors in its favor … and must also demonstrate that its risk of injury, if the injunction is denied, is one that after balancing the equities entitles it to relief." *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993). "The decision whether or not to award specific performance is one that rests in the sound discretion of the trial court." *Sokoloff v. Harriman Estates Development Corp.*, 96 N.Y.2d 409, 415, 729 N.Y.S.2d 425, 754 N.E.2d 184 (2001). A party may, under some circumstances, defeat an application for specific performance by virtue of its own mistake, "even though the mistake is the defendant's own act or omission for which plaintiff is not in the least responsible." *Da Silva v. Musso*, 53 N.Y.2d 543, 548, 444 N.Y.S.2d 50, 428 N.E.2d 382 (1981).

In *Gordon v. Mazur*, as the Appellate Division explained:

> While such a mistake might not avail the defendant in an action for damages at law, it will not foreclose inquiry by a court of equity into the justice of bes-

towing a windfall on one party because the other party misconstrued the technical provisions of their contract. Before decreeing specific performance in such a case, the court will measure the relative hardships and prejudices as well as nice legal rights.

284 A.D. 289, 131 N.Y.S.2d 261, 265 (1st Dep't 1954).

In addition, the Option Agreement provides:

> This Agreement constitutes a legal, valid and binding agreement of RJE, enforceable in accordance with its terms, except that … the remedy of specific performance … may be subject to equitable defenses and to the discretion of the court before any proceeding therefor may be brought.

Option Agreement § 3.03.

All four preliminary requirements for specific enforcement are present. The first three require no elaboration. In respect to the fourth requirement, RJE claims that it will have no adequate remedy at law if Northville refuses to go through with the bidding process. RJE is correct that money damages will not compensate it for the loss of its right under the Abandonment Provision to bid on the Pipeline System because the Pipeline System is comprised of "unique property and assets," Pl. Post–Hrg. Memo. at 22, and because its damages would be too speculative to calculate. *See Chateaugay v. LTV Corp.*, 944 F.2d 997, 1007–08 (2d Cir.1991) (holding that protection of an interest in "unique property" may warrant specific performance); *Payroll Express Corp. v. Aetna Cas. & Sur. Co.*, 659 F.2d 285, 292

at the conclusion of the hearing and addressed the issue in their post-hearing memoranda. *See* Tr. at 58–62 (Mar. 21, 2002); Def. Post–Hr'g Memo. at 28–31; Pl. Post–Hr'g Memo. at 19–25. There is no rational reason

why the Court should not now dispose of the issue; furthermore, Northville cannot claim that it has suffered any prejudice in light of the Court's decision to deny specific performance.

(2d Cir.1981) (holding that there is no adequate remedy at law when damages are too uncertain to be calculated).

The Court, nevertheless, concludes that ordering Northville to continue with the bidding process would not, in light of all the equities, do substantial justice. Northville's erroneous interpretation of the contract appears to be the result of a good faith mistake. RJE has put forth no evidence to the contrary. RJE's right to bid on the Pipeline System was actuated only by virtue of Northville's mistake. The only harm that RJE has suffered as a result of Northville's mistake has been the incidental costs incurred in obtaining the appraisals and preparing its bid, and attorney's fees and costs associated with this litigation (collectively the "incidental costs"). Assuming Northville is willing to compensate RJE for the incidental costs, specific performance will not be ordered.

## CONCLUSION

The Court declares that the "fair market value of the Pipeline System" is to be based on the fair market value of the assets comprising the Pipeline System, without offset for the costs of future remediation for existing environmental liabilities.

In respect to specific performance, Northville shall notify RJE within seven days of receipt of this Memorandum and Order whether it intends to proceed with the bidding process. If Northville decides to go forward with the bidding process, it will not be liable for the incidental costs, and bids will be due seven days after RJE receives Northville's notice. Thereafter, the process will continue in accordance with the terms of the Abandonment Provision.

If Northville declines to participate in the bidding process, it shall pay RJE the incidental costs. The parties are instruct-

ed to attempt to forthwith reach agreement as to the costs. If the parties are able to reach agreement, they shall submit a stipulation to that effect within thirty days from the date of this Memorandum and Order, and the Court will enter final judgment accordingly; otherwise, the Court will conduct a hearing to determine the incidental costs.

**SO ORDERED.**