**RJE CORP., Plaintiff–Appellee,**

v.

**NORTHVILLE INDUSTRIES CORP., Defendant–Appellant.**

**Docket No. 02–9116.**

United States Court of Appeals, Second Circuit.

Argued: May 8, 2003.

Decided: May 15, 2003.

---

John J. Kuster, D.A. Jeremy Telman, Fernando Menedez, Sidley Austin Brown & Wood LLP, New York, NY, for Plaintiff–Appellee.

Maria T. Vullo, Andrew G. Frank, Matthew J. Kalmanson, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant–Appellant.

Before: FEINBERG, KATZMANN, Circuit Judges, and MURTHA, District Judge.[1]

PER CURIAM.

Defendant-appellant Northville Industries Corp. appeals from a judgment of the United States District Court for the Eastern District of New York (Block, *J.*), granting summary judgment in favor of plaintiff-appellee RJE Corp. as to the meaning of "the fair market value of the Pipeline System" for purposes of interpreting a contract between the parties, and from an order of the District Court denying Northville's motion for reconsideration. Because we conclude that the plain and unambiguous language of the contract defines "the fair market value of the Pipeline

---

1. The Honorable J. Garvan Murtha of the United States District Court for the District of Vermont, sitting by designation.

System" as only including the assets, not ongoing liabilities, of the Pipeline System in the event of abandonment, we affirm the judgment of the District Court. We also conclude that the District Court did not abuse its discretion in denying Northville's motion for reconsideration.

BACKGROUND

Northville is a large petroleum products company whose businesses include the operation of oil terminals (the "Pipeline System"). For many years, Northville was owned by two brothers and their respective families, with the Harold Bernstein family owning 55.66% of Northville and the Raymond Bernstein family owning the remaining 44.34%. As disputes between the two families intensified in the mid-to-late 1980s, the families began to negotiate an agreement by which the Harold Bernstein family would purchase all of the Raymond Bernstein family's Northville stock. The Raymond Bernstein family incorporated RJE Corp. for the purpose of entering into this stock sale.

As these negotiations were proceeding, Northville discovered significant underground gasoline leaks at two of its oil terminals. These leaks, which gave rise to various governmental investigations and a class action lawsuit brought by local landowners, resulted in potential and indeterminate environmental liabilities that presented an obstacle for the parties' negotiations.

The parties executed a series of agreements in 1988 pertaining to the stock sale. The Stock Purchase Agreement sets forth the terms for Northville's purchase of RJE's Northville stock. Under the Stock Purchase Agreement, Northville would maintain and operate the Pipeline System, with the parties continuing to share a joint interest in the Pipeline System. The Stock Purchase Agreement lists various "related agreements," including the Purchase Price Adjustment Agreement and the Option and Proceeds Distribution Agreement ("Option Agreement").

The Option Agreement enumerates five methods by which the parties could sever their joint interest in the Pipeline System: 1) Purchase Option Provision; 2) Purchase Option Termination Provision; 3) Right of First Refusal Provision; 4) Sale Provision; and 5) Abandonment Provision. On July 27, 2001, Northville triggered the Abandonment Provision, which governs the disposition of the Pipeline System should Northville decide to shut down or cease operating the Pipeline System. The provision states:

> In the event [Northville] determines to shut down or cease operating all or substantially all of the Pipeline System (an "Abandonment"), [Northville] shall promptly notify RJE in writing and use its best efforts to obtain and deliver to RJE within 60 days of the date of abandonment, an appraisal from an investment banking firm or independent appraiser, in each case mutually agreed upon by [Northville] and RJE ..., as to *the fair market value of the Pipeline System.*

Option Agreement § 2.03 (emphasis added). Once the parties receive an appraisal of the fair market value of the Pipeline System, RJE and Northville "shall have the right to submit to each other, within thirty days of the receipt of the appraisal, a bid ... at which price it will purchase the Pipeline System or effect a Pipeline Option Termination, respectively." *Id.* If neither bid exceeds the fair market value, Northville "shall use its best efforts for a period of one-year to obtain a third-party buyer for the Pipeline System." *Id.*

Unable to agree on an appraiser, the parties altered the process so that each

party would choose its own appraiser. The parties agreed to utilize the average of these appraisals as the appraised price, unless the appraisals were more than 10% apart, in which case the two appraisers would choose a third appraiser. The parties exchanged appraisals on December 21, 2001. Northville's appraiser took into account environmental liabilities in calculating "the fair market value of the Pipeline System," and appraised the Pipeline System at a negative $12,857,000. RJE's appraiser, who ignored environmental liabilities, appraised the Pipeline System to be worth $45,000,000. Because the difference in appraisals exceeded 10%, a third appraiser was selected. On February 13, 2002, the third appraiser, who like RJE did not consider environmental liabilities, appraised the Pipeline System at $40,500,000.

The parties agreed to submit bids on March 15, 2002, but they continued to dispute how to calculate "the fair market value of the Pipeline System" for purposes of bidding. Northville declared that it was only willing to sell the Pipeline System on an "as is" basis, which would include environmental liabilities, and that if RJE bid on any other basis, Northville would consider that bid invalid. RJE brought the instant litigation seeking a declaratory judgment and specific performance as to the meaning of "the fair market value of the Pipeline System" under the Abandonment Provision in order to enable it to proceed with the bidding process. Northville agreed to toll the bidding process, and the court promptly conducted a two-day evidentiary hearing.

In a published decision dated April 25, 2002, the District Court "declare[d] that the 'fair market value of the Pipeline System' is to be based on the fair market value of the assets comprising the Pipeline System, without offset for the costs of future remediation for existing environmental liabilities." *RJE Corp. v. Northville Indus. Corp.,* 198 F.Supp.2d 249, 271 (E.D.N.Y.2002). The court "conclude[d] that the parties unambiguously intended a straight asset sale, meaning that the fair market value of the Pipeline System shall not take into account the appraised costs of future remediation." *Id.* at 263. The court also explained that "[e]ven if the meaning of 'fair market value of the Pipeline System' be deemed ambiguous, extrinsic evidence establishes that the bids are to proceed on the basis of a straight asset sale." *Id.* at 267. Finally, although the court concluded that the elements of specific performance were present, it permitted Northville to elect whether to proceed with the bidding process in accordance with the ruling or to withdraw from abandonment altogether, on the assumption that Northville would then compensate RJE for the incidental costs incurred by RJE.

Northville moved for reconsideration of the District Court's decision, requesting that the court omit certain portions of the decision that it contended are dicta and therefore should not be binding in future proceedings. Because Northville was not seeking to alter the court's conclusion, the District Court denied the motion. *RJE Corp. v. Northville Indus. Corp.,* No. 02–CV–1440, 2002 WL 1750763 (E.D.N.Y. July 29, 2002). The court noted that Northville's argument that certain language is dicta "should be reserved for any such future litigation" and refused to express an opinion as to the merits of those arguments. *Id.* at *1.

## DISCUSSION

The heart of this appeal is the meaning of "the fair market value of the Pipeline System," under the Abandonment Provision of the Option Agreement. Northville

argues that the District Court erred because "the fair market value of the Pipeline System" must take into account environmental liabilities. RJE responds that the parties contracted for a straight asset sale that did not consider such liabilities in the event of abandonment. Both parties contend that the unambiguous language of the contract, as well as extrinsic evidence, support their interpretation.

Because this case was brought in a district court within the State of New York, we turn to New York substantive law. *Schiavone Constr. Co. v. City of New York,* 99 F.3d 546, 548 (2d Cir.1996). Section 7.08 of the Option Agreement sets forth a choice of law provision selecting New York law: "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its [ ] conflict of laws rules." It is the general policy of New York courts to enforce choice of law provisions, and we therefore apply New York contract law to determine the meaning of "the fair market value of the Pipeline System" under the Abandonment Provision. *See Finucane v. Interior Constr. Corp.,* 264 A.D.2d 618, 619–20, 695 N.Y.S.2d 322, 324 (1st Dept. 1999); *see also Schiavone,* 99 F.3d at 548.

■ Where a "contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *De Luca v. De Luca,* 300 A.D.2d 342, 342, 751 N.Y.S.2d 766, 766 (2d Dept.2002). In assessing ambiguity, we consider the entire contract to "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993). Contract terms are not ambiguous if they "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *Id.; see Red Rock Commodities, Ltd. v. Standard Chartered Bank,* 140 F.3d 420, 424 (2d Cir.1998) ("A contract is not ambiguous where there is no reasonable basis for a difference of opinion."). Whether a contract is ambiguous is a question of law that we review *de novo. Sayers,* 7 F.3d at 1094.

■ We disagree with Northville's contention that "fair market value" includes environmental liabilities by operation of New York law where a private contract unambiguously provides otherwise. Various provisions of the Option Agreement, read together, provide a "definite and precise" definition of the Pipeline System that excludes environmental liabilities. *See Sayers,* 7 F.3d at 1095. The preamble to the Option Agreement defines the Pipeline System as "the properties and assets of every kind, nature and description, real, personal and mixed, tangible and intangible, including the rights to use the properties or assets of another person, which constitute a network of terminals and pipelines on Long Island, New York." The question thus becomes whether environmental liabilities are among the "properties and assets" of the Pipeline System. The preamble further instructs that "all" of these properties and assets are "more particularly described on Annex A." Annex A explains that "The Pipeline Assets shall mean the following assets and properties, but shall not include any Excluded Assets." Annex A's comprehensive list makes no mention of environmental liabilities.

Further support for RJE's interpretation comes from the liability cap contained in the Purchase Price Adjustment Agreement. The Option Agreement incorporates the Purchase Price Adjustment Agreement at Section 1.04, and therefore we read the two agreements together.

The Purchase Price Adjustment Agreement discusses Covered Liabilities, which include "any claim, obligation or governmental or regulatory mandate arising out of environmental damage or contamination ... [and] any pending litigation or other proceedings against the Company, including, without limitation [various class action suits relating to the spills]." The Agreement expressly caps RJE's payment obligations and RJE has since reached that cap. We agree with the District Court that this cap "would be illusory if Northville could obviate the limit at any time by invoking the Abandonment Provision." *RJE Corp.*, 198 F.Supp.2d at 265.

Moreover, as the District Court also noted, "[w]hen the drafters intended to require the assumption of environmental liabilities they did so explicitly." *Id.* at 267. Such is the case with the Option Agreement's Option Provision, which gives RJE an option to purchase the Pipeline System for $16,698,000. The Option Provision provides that "RJE will undertake to be liable for and discharge the liabilities and obligations set forth in Annex B hereto." Option Agreement § 1.03(b)(ii). Annex B then defines the "Assumed Liabilities" to include ongoing liabilities associated with the Pipeline System. Therefore, if RJE were to exercise the Option Provision, the contract expressly provides that RJE would assume the environmental liabilities. The Abandonment Provision contains no similar language.

Northville maintains that "[i]t would be completely anomalous for the parties to have intended for RJE to assume the environmental liabilities if it purchased the Pipeline System pursuant to the Purchase Option Provision, but not if it bid on and purchased the Pipeline System pursuant to the Abandonment Provision." This argument, however, ignores the critical distinctions between the Option Provision and the Abandonment Provision. As the District Court explained, the Option Provision "can only be invoked by RJE; the [Abandonment Provision] can only be invoked by Northville. Thus, the distinction that Northville claims would 'make no sense whatsoever,' is wholly consistent with RJE's assertion that it bargained for a cap on liabilities and that Northville could not compel RJE to assume any liabilities in excess of that cap." *RJE Corp.*, 198 F.Supp.2d at 267.

■ Because we conclude that the meaning of "the fair market value of the Pipeline System" is unambiguous, we need not look beyond the express terms of the integrated contracts. *See Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir.1990) ("Parol evidence may be admitted to explain a writing only when the terms of the writing itself are ambiguous."). Even if we were to consider extrinsic evidence, we would find no clear error in the District Court's determination that the parties intended to proceed on the basis of a straight asset sale that did not consider environmental liabilities. *See In Time Prods. Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir.1994) ( "When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract itself, including testimony offered by the parties. The court's findings as to the meaning of such a provision are findings of fact that may not be disturbed unless they are clearly erroneous.") (citation omitted); *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 44 (2d Cir.1989) ("The intent of the parties to a contract is, there is little doubt, a question of fact."), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990).

The District Court found that the evidence from the hearing "revealed that

both parties understood the cap in the [Purchase Price Adjustment Agreement] to be the realization of Raymond Bernstein's desire to limit his exposure for environmental liabilities." *RJE Corp.,* 198 F.Supp.2d at 267. The court determined that throughout the negotiations that led to the 1988 agreements, it was clear that the Raymond Bernstein family would accept only plans that capped their liabilities. *Id.* at 268. The court further explained that the conduct of the parties evidenced this liability cap, noting that Northville had borne sole responsibility for the Pipeline System's environmental liabilities since RJE had reached its payment obligation cap under the Purchase Price Adjustment Agreement. *Id.* The court also feared that, were it to accept Northville's interpretation, Northville would receive an unwarranted windfall. *Id.* at 268–69.

Mark Shehan, RJE's attorney who drafted the Abandonment Provision testified that "understood at the time [by the parties, the transaction] only dealt with assets, because the way I explained it to [Northville's] lawyers . . ., this was like a going out of business sale. You have to sell your assets, take the money, and pay off your liabilities." In response, Northville offered witnesses who testified that Northville wanted to be able to abandon the Pipeline System if the environmental liabilities became unmanageable. The District Court rejected this characterization of the genesis of the Abandonment Provision and accepted RJE and Shehan's testimony that the parties intended the transaction to involve only assets, not liabilities, in the event of abandonment. Because evidence supported the District Court's conclusion, the court did not clearly err in finding that the extrinsic evidence weighed more in favor of RJE. *See In Time Prods.,* 38 F.3d at 665 ("The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the court's finding is clearly erroneous.").

■ Lastly, Northville appeals the District Court's denial of its motion for reconsideration, in which it requested that the District Court either delete from its order statements pertaining to provisions not at issue or clarify that those statements are non-binding dicta. We review a district court's denial of a motion for reconsideration for abuse of discretion. *Devlin v. Trans. Communications Int'l Union,* 175 F.3d 121, 131–32 (2d Cir.1999). A court abuses its discretion when its decision rests on a legal error or a clearly erroneous factual finding, or when its decision does not fall within the range of permissible decisions. *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine,* 311 F.3d 488, 498 (2d Cir.2002).

We find no abuse of discretion in the District Court's denial of the motion to reconsider. The District Court properly discussed provisions related to the Option Agreement in its attempt to discern the meaning of "the fair market value of the Pipeline System." Further, whether portions of the court's discussion of these provisions is dicta is better suited to be addressed in any subsequent litigation where the issue arises.

We have considered all of the defendant-appellant's arguments and, for the reasons stated above, affirm.