GlaxoSmithKline LLC v. Dendreon Corp., 2014 NCBC 53.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF DURHAM | 11 CVS 5458 |

GLAXOSMITHKLINE LLC, )
)
      Plaintiff, )
)
   v. )     **ORDER AND OPINION**
)
DENDREON CORPORATION, )
)
      Defendant. )
)

{1} THIS MATTER is before the Court on Plaintiff GlaxoSmithKline, LLC's Motion for Partial Summary Judgment ("GSK's Motion") and Defendant Dendreon Corporation's Cross-Motion for Summary Judgment ("Dendreon's Motion"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons expressed below, GSK's Motion is GRANTED in part and DENIED in part, and Dendreon's Motion is GRANTED in part and DENIED in part.

> *Womble Carlyle Sandridge & Rice, LLP by Pressly M. Millen and Betsy Cook Lanzen for Plaintiff.*

> *Hunton & Williams LLP by Patrick L. Robson, Melissa A. Romanzo, Thomas G. Slater, Jr., and D. Kyle Sampson for Defendant.*

## I.    INTRODUCTION

{2} GlaxoSmithKline, LLC ("GSK") and Dendreon Corp. ("Dendreon") contracted for GSK's production of PA2024, a recombinant prostate antigen used by Dendreon to manufacture Provenge®, a treatment for certain forms of prostate cancer. Dendreon exercised its right to terminate the contract. GSK does not contest Dendreon's right to terminate but contends that Dendreon has failed to abide by its termination obligations in failing to make certain payments to GSK.

Dendreon contends that it has fulfilled all termination obligation barring any breach of contract claim, and that GSK's other claims are not actionable claims in light of the express contractual provisions.

{3} Each party contends that the court can and should summarily determine the competing positions based on contractual provisions which are not ambiguous. They agree the contract claim is governed by New York law.

{4} The Court concludes that there are no unresolved material issues of fact, the relevant contract terms are not ambiguous, and that, as a matter of law: GSK is entitled to be paid for a Firm Order for 700 grams of PA2024; GSK is not entitled to Extension Payments; and GSK's claims should be limited to breach of contract, so that its claims for breach of the implied covenant and for unfair and deceptive trade practices should be dismissed.

{5} Accordingly, each of the Motions is GRANTED IN PART and DENIED IN PART.

## II. PROCEDURAL BACKGROUND

{6} GSK initiated this action on October 27, 2011. GSK's initial complaint asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing. With leave of court, GSK by amendment added a claim for an unfair and deceptive trade practice pursuant to N.C. Gen. Stat. § 75-1.1. Dendreon filed its Answer and Counterclaim for breach of contract on January 12, 2012. GSK replied on February 23, 2012.

{7} GSK filed its Motion for Partial Summary Judgment on December 5, 2013, seeking summary adjudication that Dendreon is liable to GSK for payment on a "Firm Order" representing the first eighteen months of a rolling thirty-six month needs forecast for PA2024, last affirmed on August 22, 2011. On January 7, 2014, Dendreon both filed its opposition to GSK's Motion and filed its own Cross-Motion for Summary Judgment. In opposing GSK's Motion, Dendreon asserts that it exercised its uncontested contractual right to terminate, and was entitled to cancel

the Firm Order GSK seeks to enforce because GSK had not yet begun to manufacture Product prior to termination. By its Cross-Motion, Dendreon seeks a summary adjudication that it has fully complied with its termination obligations, which would include the determination that GSK is not entitled to Extension Fees for the two months following notice of termination, nor does GSK have a basis to assert any claim other than its breach of contract claim.

{8} GSK later on June 11, 2014 filed a separate motion for summary judgment attacking Dendreon's counterclaims. That motion is not presently before the Court and is not addressed by this Order and Opinion.

{9} Both Motions now before the Court are fully and extensively briefed; the court has heard oral argument; and the Motions are ripe for disposition.

## III. STATEMENT OF RELEVANT UNCONTESTED FACTS

{10} A court does not make findings of fact when ruling upon summary judgment, but it may summarize undisputed material facts upon which its determination rests. *See, e.g.*, *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).

{11} While the briefs reflect certain factual disputes, the material facts necessary to resolve the Motions are uncontested. Those facts are detailed below for explanation of the Court's determinations.

### A. The Essential Contractual Terms

{12} The dispute primarily includes contested interpretation of provisions in and obligations arising from the "Development and Supply Agreement Between GlaxoSmithKline LLC and Dendreon Corporation Effective As of September 15, 2010" ("DSA"). The DSA in its Section 16.4 incorporates certain provisions of an earlier Heads of Agreement the parties entered on December 18, 2009.

{13} The DSA provided that GSK would first undertake activities to implement, scale-up, test, and validate a manufacturing process for a Product,

defined as PA2024. This effort was to be accomplished during a "Process Implementation Phase." The end result of the Process Implementation Phase was the successful manufacture of three consecutive Conformance Batches. The Process Implementation Phase would then be followed by the "Manufacture Phase," during which GSK would manufacture and supply the Product for human clinical trial and commercial use.

{14} Although the DSA defines many terms, it does not define the term "manufacture."

{15} DSA Section 2.4(a) reflects that the Process Implementation Phase was initially projected to end as of August 1, 2011, but could be extended in the event of a "Delay Event." If a Delay Event occurred, Dendreon could elect to have GSK continue efforts to implement the Process for a maximum period of six months, in which event, Dendreon would pay GSK a monthly Extension Fee of two million dollars ($2,000,000). A Delay Event was defined to exclude delay caused solely by GSK's action or inaction.

{16} DSA Section 2.4(b) provides that if one or more Delay Events occur such that Conformance Batches have not commenced by September 1, 2011, then either GSK or Dendreon could terminate the DSA upon sixty days' prior written notice. During the sixty-day termination period, each would perform its termination obligations but would not be required to continue Commercially Reasonable Efforts to implement the Process.

{17} It is undisputed that Conformance Batches had not commenced by September 1, 2011. It is further undisputed that there had been Delay Events.

{18} On September 1, 2011 Dendreon provided sixty days' written notice that the DSA was terminated effective October 31, 2011. ("Termination Letter")

{19} Dendreon paid GSK a one-month's Extension Fee for the month of August 2011. It has not paid GSK an Extension Fee for September 2011 or October 2011, although as discussed below, it offered to pay two months' Extension Fees if GSK would acknowledge and agree that Dendreon had cancelled the Firm Order that had been placed before notice of termination.

{20}    GSK did not acknowledge that the Firm Order placed before notice of termination was cancelled or that Dendreon had the right to cancel it.  GSK asserts that it is entitled to recover payment for a Firm Order of 700 grams of Product.[1] GSK contends that the obligation to pay matured as of the date of termination, because the Termination Letter effectively precluded GSK from further manufacturing and triggered the contractual provision that excuses GSK from any obligation to manufacture Product.  Dendreon instead contends it could cancel the Firm Order if it did so before GSK had commenced actual product manufacture.

{21}    The obligation for Dendreon to place a Firm Order was triggered immediately upon executing the DSA.  DSA Section 3.3 required Dendreon on the Effective Date to provide GSK with a thirty-six month non-binding rolling forecast of its Product requirements.  Dendreon was required to update the forecast before the first day of each calendar quarter.  The first eighteen months of each forecast is deemed a binding "Firm Order."  GSK was required to accept or reject each such Firm Order within fifteen days of receiving the forecast.  The DSA defines a Firm Order to be "a binding obligation to purchase the grams of Product specified therein."  (DSA § 1.)

{22}    The DSA defines "Product", to wit:

"Product" shall mean purified bulk component of PA2024, a recombinant prostate antigen. The Product is a raw material used in the manufacture of sipuleucel-T, Dendreon's cancer immunotherapy marketed as Provenge® pursuant to the BLA.

(DSA § 1.)  The "BLA" is the Biological License Application filed with the FDA for the Product.

{23}    While the DSA defined certain performance specifications for the commercial product, the definition of Product does not itself incorporate those specifications.

---

[1]The total of 700 grams represented 300 grams for the first partial year of the Manufacture Phase and the full year thereafter.  This was the amount stated in the first forecast after the DSA was entered, and has been reaffirmed, the last time on August 22, 2011.  The same 700 gram figure is reflected in DSA Schedule 4.1 related to pricing.

{24}     DSA Section 2.3 provides that upon accepting a Firm Order, GSK was required to reserve appropriate manufacturing capacity to meet the forecasted demand.  GSK also acknowledged when executing the DSA that it had been paid for the reservation of capacity by receipt of the reservation fee as provided by the Heads of Agreement.

{25}     DSA Section 4.1 establishes a mechanism for determining pricing for initial efforts during the Process Implementation Phase, for manufactured product, and for Extension Fees if owed.

{26}     Article 7 of the DSA provides for cross-licensing of the parties' respective intellectual property in performing obligations under the DSA.

{27}     While DSA Section 2.4 allowed for termination in the event Conformance Batches had not begun as of September 1, 2011, the termination obligations for any termination were provided in DSA Article 14.  Section 14.2 provides for a notice and cure process prior to termination for material breach.  When terminating, Dendreon relied on the failure to commence Conformance Batches as provided in Section 2.4, and its Termination Letter did not recite any claimed material breach.

{28}     Article 14 provides for when payments will be required in connection with termination.   Section 14.3(a)(4) relates to payments for Product batches completed at the time of termination which meet conformance requirements for Final Release.  Section 14.3(a)(5)  relate to payment for Product batches which had been initiated as of the date of termination.  GSK does not claim that it had initiated or completed Product batches subject to this subparagraphs.

{29}     GSK premises its claim for the Firm Order of 700 grams on Section 14.3(a)(6), which provides that:

> In the event . . . (ii) Dendreon instructs GSK to cease manufacture of Product, with respect to Firm Orders placed by Dendreon prior to the effective date of termination or the date on which manufacture ceases (as the case may be), Dendreon shall pay one hundred percent (100%) of the then applicable Price for the grams of Product specified in said Firm Orders and meet Final Release specifications; and unless Dendreon instructs GSK in writing to cease manufacture of the grams

of Product specified in said Firm Orders, GSK shall complete the manufacture of grams of Product specified in said Firm Orders.

(DSA § 14.3(a)(6).)

{30} GSK and Dendreon agree the Firm Order had been placed before termination. The dispute concerns whether GSK was instructed to cease manufacture, and if so, whether that leads to the conclusion that it is entitled to be paid for Product specified in the Firm Order even though it necessarily could not meet Final Release specifications when it could not be manufactured because of Dendreon's instruction, or whether payment is only due when Product which meets those specifications has been made.

{31} Section 15.4 of the DSA provides that the DSA and Heads of Agreement are to be governed by, construed and enforced pursuant to New York law.

## B. Events Surrounding Dendreon's Termination

{32} Dendreon's Termination Letter, dated September 1, 2011, made termination effective as of October 31, 2011.

{33} The Termination Letter asserts that the termination was pursuant to Sections 2.4 and 14.2(d) of the DSA because of Delay Events such that Conformance Batches had not commenced by September 1, 2011.

{34} The Termination Letter recites Dendreon's position that it was entitled to cancel all prior purchase orders. It offers to pay Extension Fees, conditioned on GSK acknowledging and accepting that such orders had been cancelled. The letter recites, in part, as follows:

> By signing the acknowledgement below, GSK agrees with Dendreon that the Agreement is rightfully terminated and that each Party shall fulfill its termination obligations under the Agreement. The Parties further agree for clarity that, as the Manufacturing Phase has not yet commenced and no production runs or Product batches have been initiated as of the date hereof nor will be initiated prior to the Termination Effective Date, Dendreon has no liability to GSK for the costs of any Product purchase orders, which are all hereby formally cancelled. Subject to GSK's acknowledgement and agreement below:

(1) Dendreon will continue to pay GSK the Extension Fee of $2 million per calendar month through the Termination Effective Date, for a total payment of $4 million; (2) Dendreon acknowledges that the $1 million suite reservation fee is forfeited to GSK as of Termination Effective Date; and (3) upon receipt of, and in accordance with, shipping instructions from Dendreon, GSK will ship (or in the case of certain raw materials, destroy, as requested by Dendreon) equipment and raw materials purchase on behalf of Dendreon in support of the Agreement and invoice Dendreon for such activities.

(Pl.'s Mot. Partial Summ J., Ex. E ("Termination Letter").)

{35}    In response, GSK asserted that the Firm Order had not been cancelled and demanded that Dendreon pay the contract Price 700 grams of Product.

{36}    Dendreon reaffirmed the forecast which included an initial 700 gram eighteen month forecast on August 22, 2011, although both GSK and Dendreon have pointed to evidence that by that date other facts had been made public which cast doubt on this need. GSK, in fact, contends that facts now reveal that Dendreon knew that it would need no Product during the forecasted period.

## C. Summary of Claims and Defenses

### 1. Contractual Termination Obligations

{37}    GSK contends the Termination Letter instructed GSK to cease manufacture within the meaning of DSA Section 14.3(a)(6), excusing GSK from any responsibility to complete manufacture and obligating Dendreon to pay for the Firm Order placed prior to the date of termination. GSK further asserts its right to Extension Fees for the two months included in the termination period of sixty days after notice. GSK asserts that Dendreon's early termination resulted in savings, including further Extension Fees and other costs that would have been incurred by continuing the DSA beyond the termination effective date. GSK further asserts that payment to it for the Firm Order is fair compensation for other manufacturing opportunities GSK forewent in entering the DSA.

{38}    Dendreon contests any obligation to pay either for the Firm Order or Extension Fees. As to the Firm Order, Dendreon contends that: (1) in the first

instance, the Termination Letter cannot be fairly read to instruct GSK to cease within the meaning of DSA Section 14.3(a)(6) because GSK had not completed the Process Implementation Phase and had never begun manufacture; (2) even if the Termination Letter could be read as GSK contends, the contract language clearly obligates Dendreon to pay only for Product which meets Final Release specifications; (3) therefore, a Firm Order could be cancelled without payment prior to actual manufacturing of Product batches had begun. Dendreon contends affording GSK payment for Product it never manufactured would be both a windfall for GSK and an illegal penalty against Dendreon. As for Extension Fees, Dendreon acknowledges that it made a compromise offer to pay them in exchange for GSK agreeing that the Firm Order had been cancelled, but when GSK refused to so agree, the contract language controls, and the contract language clearly conditions the payment of any Extension Fee on Dendreon requesting GSK to continue efforts to extend the Process Implementation Fees and the Termination Letter clearly did not represent that Dendreon had so requested.

## 2. GSK's Claims Other Than Breach of Contract

{39} GSK contends that, at a minimum, there are fact issues as to whether first, Dendreon committed an unfair and deceptive trade practice act and breached the implied covenant of good faith and fair dealing. Dendreon denies the factual premise of those claims, but asserts through its Cross-Motion that the claims simply mirror GSK's breach of contract claim and cannot proceed as independent claims.

### a. The Chapter 75 Claims

{40} GSK's Chapter 75 claim makes three essential allegations:

(a) Dendreon attempted to coerce GSK to surrender its rights under the DSA by withholding $4 million in Extension Fees Dendreon knew it owed;

(b) Dendreon provided GSK with a knowingly false forecast while surreptitiously planning to terminate the DSA; and

(c) Dendreon communicated false statements as a pretext to conceal damages that would be owed upon termination of the DSA.

(Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl. Opp'n Br.") 9.)

{41}   These allegations revolve around the forecast issued on August 22, 2011, which was followed by the September 1, 2011 Termination Letter.  While GSK asserts that the forecast was deceptive because Dendreon knew that it would not need the Product as forecasted,  GSK also alleges that during August 2011 Dendreon made public statements regarding reduced demand for Provenge, had reduced its revenue guidance downward as a result, and had begun moves to reduce expenses and realign its workforce.  (Pl.'s Mem. Supp. Mot. Partial Summ. J. 8.) GSK contends that Dendreon sought to feign a contamination event as a basis to "slow walk" GSK's development schedule, knowing that it intended to terminate the DSA, and its effort to do so was to minimize Dendreon's exposure.  (Pl. Opp'n Br. 5– 6, Exs. J, L (indicating August conclusion that no Product would be needed from GSK).)  GSK cites testimony and documents which it contends prove that Dendreon sought to mask its true intentions.  But, viewed in context, this testimony and the documents indicate that the underlying activity of which GSK complains very closely preceded Dendreon issuing its Termination Letter, and that withholding the truth from GSK, if it occurred, was necessary for Dendreon's management to finalize its decision to terminate before making any statement of its intent to do so. (Pl. Opp'n Br. Ex. L; Marcus Dep. 172:15–16, Jan. 10, 2013 (Dendreon "should wait on telling GSK to hold off on anything until next week").)

{42}   GSK casts Dendreon's conditioning Extension Fees payment on GSK's acquiescence in cancelling the Firm Order as an inequitable use of power and position.  (Pl. Opp'n Br. 10–12.)

{43}   Dendreon's opposition is essentially that these claims merely repackage GSK's breach of contract claim, are not separately actionable, and fail for the same reasons that the breach of contract claim fails.

### b. The Implied Covenant of Good Faith and Fair Dealing Claim

{44}   GSK contends that "Dendreon violated the covenant of good faith and fair dealing when it ordered GSK to cease its manufacture of Firm Orders of PA2024 so that Dendreon could disingenuously and erroneously disclaim its "binding obligation" to pay GSK the price for all Firm Orders.  (Pl. Opp'n Br. 16.) GSK elaborated in its brief as follows:

> To be clear, Dendreon breached the DSA when it terminated the parties' contract without paying GSK for all Firm Orders, and this is the primary source of GSK's breach of contract claim.  However, this is not the source of GSK's breach of the covenant of good faith and fair dealing claim.  Rather, the basis of this claim is Dendreon's bad faith contrivance to terminate the contract prior to the commencement of the manufacturing phase (a condition precedent asserted by Dendreon) for the purpose of reducing its termination obligations.

(Pl. Opp'n Br. 19.)

{45}   In short, GSK claims Dendreon terminated the DSA early so that it could wrongfully disclaim any obligation to pay for a Firm Order when the Manufacture Phase had not yet begun.  This, GSK contends, constituted a breach of the implied covenant in addition to the breach of the express terms of the contract which mandated payment.

{46}   As with the Chapter 75 claim, Dendreon contends the claim is no more than a repackaging of the breach of contract claim and cannot be separately actionable.

## IV.   LEGAL STANDARDS

### A. The Summary Judgment Standard

{47}   Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and submitted affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law.  N.C. R. Civ. P. 56(c); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

{48}     The moving party must demonstrate the absence of a triable issue and does so either "(1) by showing that an essential element of the opposing party's claim is nonexistent; or (2) by demonstrating that the opposing party cannot produce evidence sufficient to support an essential element of the claim or overcome an affirmative defense which would work to bar [its] claim." *Wilhelm v. City of Fayetteville*, 121 N.C. App. 87, 90, 464 S.E.2d 299, 300 (1995) (citing *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 414 S.E.2d 339 (1992)).

{49}     If the moving party carries this burden, the nonmoving party "must 'produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial.'" *Roumillat*, 331 N.C. at 63, 414 S.E.2d at 342 (quoting *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989)); *Rankin v. Food Lion*, 210 N.C. App. 213, 217, 706 S.E.2d 310, 313–14 (2011).  This forecast "may not rest upon the mere allegations or denials of [a] pleading." N.C. R. Civ. P. 56(e).

## B.  New York Principles of Contract Law

{50}     The Court finds the DSA's choice of law provision valid and enforceable. *See, e.g.*, *Cable Tel. Servs. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002) (noting North Carolina courts typically enforce choice-of-law provisions in contracts).  Accordingly, the breach of contract and implied covenant of good faith and fair dealing related to the contract are governed by New York law.

### 1.  Enforcing a Contract of Which Terms Are Not Ambiguous

{51}     When "parties dispute the meaning of particular contract terms," the court must first "determine whether such terms are ambiguous." *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 951 N.Y.S.2d 19, 24 (N.Y. App. Div. 2012).  This is a question of law for the court. *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007).  Unambiguous contract provisions are then interpreted by the court as a matter of law unaided by extrinsic evidence. *Beal Sav.*

*Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

{52}    "A contract is ambiguous if the terms are 'reasonably susceptible [to] more than one interpretation.'" *Obstfeld v. Thermo Niton Analyzers, LLC*, 977 N.Y.S.2d 371, 373 (N.Y. App. Div. 2013) (quoting *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986)).  But a contract is not ambiguous if its terms "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (applying New York law) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (applying New York law)); *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978).  The critical test is whether each of competing interpretations are reasonable.   A contract term "does not become ambiguous merely because the parties urge different interpretations . . . unless each is a 'reasonable' interpretation[.]" *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (applying New York law).

{53}    In assessing the reasonableness of competing contract constructions, the court examines "the entire contract and consider[s] the relation of the parties and the circumstances under which it was executed, with the wording viewed in the light of the obligation as a whole and the intention of the parties as manifested . . ." *Banco Espirito Santo, S.A.*, 951 N.Y.S.2d at 24 (citations and marks omitted).  The court neither grafts conditions onto the contract language the parties themselves did not incorporate nor construes the language in a manner that distorts the meaning of terms the parties did include. *Korosh v. Korosh*, 953 N.Y.S.2d 72, 74 (N.Y. App. Div. 2012).   A court is reluctant to imply a term the parties could have but neglected to include. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 572 (N.Y. 1978)).  Where possible, the court construes the contract which neither renders an included term meaningless , nor give a term a meaning inconsistent

with other contract terms. *Compare RJE Corp.*, 329 F.3d at 314 *and Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (N.Y. App. Div. 2013), *with Bijan Designer for Men, Inc. v. Fireman's Fund Ins. Co.*, 705 N.Y.S.2d 30, 33–34 (N.Y. App. Div. 2000) (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (1927) and *Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 395–96 (2d Cir. 1985)). Likewise, a construction of contract terms which would create unintended and unfair inconsistencies that are not otherwise apparent should be rejected. *James v. Jamie Towers Hous. Co.*, 743 N.Y.S.2d 85, 88 (N.Y. App. Div. 2002), *abrogated on other grounds by Kershaw v. Hosp. for Special Surgery*, 978 N.Y.S.2d 13, 19–22 (N.Y. App. Div. 2013).

## 2. The Implied Covenant of Good Faith and Fair Dealing

{54} New York law implies a covenant of good faith and fair dealing during the course of performance into every contract in order to prohibit one party from performing in a manner that deprives the other of the benefits of the contract. *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 773 N.E.2d 496, 500 (N.Y. 2002); *see also Wieder v. Skala*, 609 N.E.2d 105, 109 (N.Y. 1992). However, New York precedent "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Fantozzi v. Axsys Tech, Inc.*, No. 07 Civ. 2667 (LMM), 2007 U.S. Dist. LEXIS 61448, at *4–5 (S.D.N.Y. Aug. 20, 2007) (quoting *Harris v. Provident Life and Acc. Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002)). "A claim for breach of the implied covenant [of good faith and fair dealing] 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) (quoting *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F. Supp. 964, 989, *modified*, 914 F. Supp. 997 (S.D.N.Y. 1995)); *see also Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49–50 (N.Y. App. Div. 2010).

{55}     Where a breach of contract claim is based on termination, an implied covenant claim does not preclude an unqualified right to terminate, and generally the motive that leads the party to exercise an express unconditional right to terminate is not controlling. *Triton Partners LLC v. Prudential Sec. Inc.,* 752 N.Y.S.2d 870 (N.Y. App. Div. 2003). However, the implied covenant may constrain a party from exercising a contract right if the exercise is misused for the purpose of gaining unfair personal gain while at the same time foreclosing the other party's ability to enjoy expected benefits of the contract. *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 586–87 (N.Y. App. Div. 2003). In general, a contracting party may not unfairly take action that blocks the opposing party's ability to perform a condition precedent in order to invoke failure to meet that condition to defeat its own contract obligations. *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992). On the other hand, the implied covenant of good faith and fair dealing is not intended to forestall a party from relying on a reasonable construction of express contract language to assert unmet conditions that are precedent to the opposing party's ability to receive benefits under the contract. *Moran v. Elk,* 901 N.E.2d 187, 190 (N.Y. 2008).

{56}     "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *D&L Holdings, LLC v. RCG Goldman Co.*, 734 N.Y.S.2d 25, 31 (N.Y. App. Div. 2001).

## C. The Unfair and Deceptive Trade Practice Claim

{57}     Both parties brief their arguments regarding GSK's unfair and deceptive trade practice claim pursuant to North Carolina law, on the apparent understanding that the claim is extra-contractual and is not governed by the contract's choice of law provision. The proper conflicts of law rule to be applied to Chapter 75 claims remains uncertain, as different North Carolina Court of Appeals decisions have applied both a test of most significant relationship and the rule of *lex*

*loci.  See* Noel L. Allen, *North Carolina Unfair Business Practice* § 5.05, and cases cited (3rd ed. 2014).  Here, the facts appear to be such that a detailed comprehensive conflicts of law analysis would result in the application of North Carolina law under either test.  As both parties proceed on the basis of North Carolina law, the court does not undertake such a comprehensive analysis.

{58}    The elements of a Chapter 75 claim are well known and need not be extensively discussed here.  They include an unfair or deceptive act, in commerce, which proximately causes injury.  *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87–88, 747 S.E.2s 220, 226 (2013).  GSK here relies on a line of cases which recognize on their particular facts that an "inequitable assertion of power or position" can constitute an unfair and deceptive trade practice.  *E.g., Gray v. N.C. Ins. Underwriting Ass'n,* 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).  Likewise, breaches of contract accompanied by egregious or aggravated circumstances may give rise to an unfair and deceptive trade practice.  *E.g., Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115 (1993), but generally, a breach of contract without such circumstances does not give rise to a separate claim for an unfair and deceptive trade practice.  *Broussard v. Meineke Discount Muffler Shops. Inc.*, 155 F.3d 331, 347 (4th Cir. 1998).   Chapter 75 claims are not intended to constrain a party's appropriate assertion of contract rights by raising them to the level of an unfair and deceptive trade practice.  *Harris v. NCNB Nat. Bank of N.C.*, 85 N.C. App. 669, 673, 355 S.E.2d 838, 842 (1987).

## V.    ANALYSIS

### A.  GSK's Breach of Contract Claim

{59}    GSK's Motion focused on its right to payment for a Firm Order made and accepted before termination, apparently believing that Dendreon had conceded its obligation to pay Extension Fees for the two months within the requisite sixty days' notice of termination.  Dendreon has contested any such obligation, in response to which GSK contends that the court should determine that it is entitled to both payment for the Firm Order and for the Extension Fees.

1. <u>**Payment for a Firm Order of 700 Grams of Product**</u>

{60} The parties agree that Dendreon was entitled to and did terminate the DSA pursuant to Sections 2.4(b) and 14.2(d) because Conformance Batches had not commenced by September 1, 2011. GSK does not claim wrongful termination. The dispute is rather what termination obligations arose.

{61} The Court has carefully and thoroughly considered the respective contract interpretations, as New York directs. Having done so, the Court concludes that the relevant contract terms are not ambiguous and may be enforced as a matter of law, with no need for further proceedings to resolve uncontested issues of material fact. As to each contract term the Court must construe, the Court finds that only one of the tendered interpretations is reasonable. The Court concludes that GSK is entitled to be paid for the Firm Order of 700 grams of Product but is not entitled to Extension Fees.

{62} To determine GSK's right to payment for a Firm Order of 700 grams of Product, the Court must construe and apply DSA Sections 2.4 and 14.3(a)(6).

{63} Other payment provisions in Article 14 need not be considered. Dendreon has not asserted GSK's material breach as a ground for termination, relying solely on termination pursuant to Section 2.4 which allows termination in the event that Conformance Batches had not commenced before September 1, 2011. No payment is required pursuant to DSA Section 14.3(a)(4), as payments under this subsection are for "Product batches completed at the time of termination[,]" and there are no such batches. No payment is required pursuant to DSA Section 14.3(a)(5), as payments under this subsection are for "Product batches that had been initiated" as of the date of termination, and there are no such batches.

{64} Following Dendreon's termination pursuant to Section 2.4, GSK is then entitled to payment for Product pursuant to a Firm Order placed prior to termination only if it is so entitled by DSA Section 14.3(a)(6). The contract language requires the Court to determine first whether "Dendreon instruct[ed] GSK to cease manufacture of Product, with respect to Firm Orders placed by Dendreon prior to the effective date of termination[,]" and second, even if so, whether

Dendreon is nevertheless obligated to pay only for Product actually manufactured and meeting Final Release specifications.

{65}   There can be no serious dispute that there was a binding Firm Order of 700 grams of Product prior to the effective date of termination.  This was the eighteen-month forecast of each of the thirty-six-month forecasts Dendreon gave immediately after the DSA Effective Date and last affirmed on August 22, 2011, several days before it sent the Termination Letter on September 1, 2011.  That same 700 gram figure is incorporated into DSA Schedule 4.1.

{66}   Section 14.3(a)(6) employs the term "manufacture," which the DSA does not define.  Dendreon contends "manufacture" necessarily means actual manufacture, which would occur no earlier than manufacture of Conformance Batches in the Process Implementation Phase or more appropriately after the Manufacture Phase had commenced.  Based on this reasoning, Dendreon contends, a binding Firm Order could be cancelled on and after September 1, 2011 so long as Conformance Batches had not commenced.  Essentially, the construction is that the Firm Orders did not become binding in a manner for which a payment obligation would mature until Product meeting Final Release specifications had occurred.

{67}   GSK contends that "manufacture" has a much broader meaning, which included efforts during the Process Implementation Phase, and further that the DSA clearly and repeatedly recognizes that a Firm Order was "binding," and could not, therefore, be cancelled unilaterally with no consequence.  GSK further contends that the Firm Order became binding when accepted, and the express language of Section 14.3(a)(6) clearly recognizes that GSK was excused from manufacturing Product meeting Final Release specifications when it was instructed to cease efforts toward such manufacture.  That is, GSK contends that Section 14.3(a)(6) afforded Dendreon the option to "take or pay," meaning that it could take Product GSK manufactured or pay GSK when exercising its option to direct GSK to cease such manufacture.

{68}   Construing all contract terms together, the Court accepts GSK's construction as reasonable and rejects Dendreon's construction as unreasonable.

The Court concludes both that the term "manufacture" includes not only the actual manufacture in the Manufacture Phase, but also efforts during the Process Implementation Phase. Notwithstanding whether "manufacture" would begin prior to commencing Conformance Batches, Dendreon clearly instructed GSK to cease efforts for such manufacture, and the language of Section 14.3(a)(6) did not vest in Dendreon the right to instruct that such efforts cease without further obligation simply because that instruction preceded actual Product Manufacture. As the Court also concludes that the Termination Letter instructed GSK to cease manufacture, GSK's right to payment for the Firm Order placed prior to termination matured upon termination and any obligation GSK had to manufacture Product meeting Final Release specifications was excused.

{69}    The Termination Letter does not contain language that incants the exact contract language of "instructs to cease manufacturing." However, the Termination Letter has exactly that effect. The letter unequivocally states that the DSA has been terminated, that Dendreon considers all Firm Orders cancelled, and that GSK was clearly to undertake no further efforts toward manufacture. GSK no longer was licensed to use Dendreon's processes and intellectual property. GSK was, by Dendreon's follow-up letter, instructed to return equipment, raw materials and supplies.

{70}    After termination, GSK was effectively unable to manufacture Product.

{71}    The Court concludes that Dendreon, by its termination of the DSA, its purported termination of the Firm Orders, its withdrawal of the license to use Dendreon intellectual property, and its demand for return of raw material and supplies, effectively instructed GSK to cease manufacture within the meaning of DSA Section 14.3(a)(6).

{72}    To construe the contract otherwise would be inconsistent with the language of Section 14.3(a)(6) which clearly looks backward toward a Firm Order that preceded termination, and the definition of a Firm Order which clearly became binding almost immediately after the DSA Effective Date. The DSA keys the necessary instruction to cease manufacture to "Firm Orders placed by Dendreon

prior to the effective date of termination or the date on which manufacture ceases (as the case may be)[.]"  (DSA § 14.3(a)(6).)  The clause equally reaches a binding Firm Order committed early in the Process Implementation Phase as well as to subsequent Firm Orders that might be placed in the Manufacture Phase.

{73}    It is clear that the parties did not include any provision that a binding Firm Order could be cancelled and payment could be avoided if the Firm Order was cancelled at a time prior to commencing Conformance Batches.

{74}    The Court concludes that DSA Section 14.3(a)(6)'s use of the term "manufacture" is not ambiguous.   The Court should not imply a term the parties neglected or chose not to include.  Implying a term allowing for cancellation of a binding Firm Order without payment liability would be inconsistent with other express terms of the contract.  In particular, it would render the term "binding" ineffective and meaningless when applied to any Firm Order.  Dendreon's tendered construction allowing it a right to cancel a binding Firm Order is unreasonable.

{75}    The Termination Letter clearly instructed GSK to cease manufacture and GSK is entitled to payment for the Firm Order of 700 grams of Product unless the DSA conditions payment on having actually manufactured Product meeting Final Release specifications.  Of course, Dendreon instructed GSK to cease efforts to manufacture any such product.

{76}    In addition to the New York rules of construction noted above, the Court is further guided by New York principles which preclude a party from relying on a contract condition precedent when its own conduct prevents the opposing party from performing that condition.  *A.H.A. Gen. Constr., Inc. v. N.Y. City Hous. Auth.*, 92 N.Y.2d 20, 31 (1998).  The chosen contract language of DSA Section 14.3(a)(6) adheres to this principle, for it obligates GSK to proceed with manufacture *unless* it is instructed to cease manufacture, in which event its further obligation to manufacture is excused.

{77}    Dendreon argues that allowing GSK to receive payment without having actually manufactured Product ignores express language of Section 14.3(a)(6) which refers to payment of "one hundred percent (100%) of the then

applicable Price for the grams of Product specified in said Firm Orders *and meet Final Release Specifications.*" (DSA § 14.3(a)(6) (emphasis added).) Dendreon would continue to impose the obligation to meet Final Release specifications even when it instructed GSK to cease manufacture, thereby making performance of the condition precedent to payment impossible. Dendreon's tendered construction would instead ignore the express language which obligates GSK to continue to perform "*unless* Dendreon instructs GSK in writing to cease manufacture of the grams of Product specified in said Firm Orders." (emphasis added).

{78} Dendreon's tendered contract construction is unreasonable. The language of DSA Section 14.3(a)(6) is not ambiguous. GSK was excused from further performance when it was instructed to cease manufacture. Its right to payment on the binding Firm Order of 700 grams of Product matured upon its receipt of that instruction and the termination of the DSA. GSK's right to payment for the Firm Order of 700 grams of Product, made and accepted prior to termination, was not and is not condition on manufacturing Product which meets Final Release specifications.

{79} Dendreon had the right to elect to have GSK cease manufacture as of September 1, 2011 when Conformance Batches had not commenced. However, upon exercising that election, GSK became entitled to be paid the appropriate Price for the Firm Order that was then binding. GSK is entitled to that payment.

{80} The Court has considered but rejects Dendreon's argument that such payment is both an unexpected windfall to GSK and an illegal penalty against Dendreon. DSA Sections 2.4 and 14.3(a)(6) represent a reasonable contractual allocation of rights between the parties. In exercising the right to terminate and to instruct GSK to cease manufacture, Dendreon avoided substantial future expense. GSK was limited to payment for binding Firm Orders which preceded termination.

{81} Dendreon is obligated to pay GSK the contract Price for the Firm Order of 700 grams of Product.

{82} The Motions do not request the Court further to determine the Price that must be paid for the Firm Order of 700 grams of Product. The Court does not

then do so.  It need not construe the Price terms of the DSA.  It need not further consider whether Dendreon is entitled to an offset for savings GSK may have enjoyed as a result of the instruction to cease manufacture.  It need not consider any other offset by reason on Dendreon's counterclaims, concerning which GSK's later motion for summary judgment is not yet before the Court.

{83}    To the extent that GSK's Motion seeks summary judgment that it is entitled to be paid on a Firm Order for 700 grams of Product, GSK's Motion is GRANTED.  To the extent that Dendreon's Cross-Motion seeks summary judgment that it had the right to cancel that Firm Order and is not obligated to pay GSK for that Firm Order, Dendreon's Motion is DENIED.

## 2. Payment of Extension Fees After Notice of Termination Period

{84}    GSK contends that it is entitled to $4 million in Extension Fees representing $2 million for each of the two months following notice of termination on September 1, 2011.  Dendreon's Cross-Motion seeks summary judgment that these Extension Fees are not owed.  The Court concludes that Dendreon's position should be sustained.

{85}    GSK contends that Dendreon itself recognized its obligation to pay those Extension Fees when it terminated the DSA.  It is clear that the Termination Letter offered to pay $4 million of Extension Fees if GSK acquiesced that any binding Firm Order preceding termination had been cancelled.  GSK further asserts that Dendreon's corporate representatives made a binding admission of liability for such Extension Fees.  After careful review and consideration, the Court concludes that GSK's right should be instead be measured by the express contract language and Dendreon has not made any binding admission of liability inconsistent with that the contract terms.

{86}    The Court looks to the clear contract language regarding the payment of Extension Fees.  The DSA provides that:

> [i]f a Delay Event occurs (as defined below) *and Dendreon elects to have GSK continue efforts to implement the Process* for a maximum of up to six (6) months, then Dendreon shall commence paying GSK a fee

of two million dollars ($2,000,000) per month during such extension period (the "Extension Fee").

(DSA § 2.4(a) (emphasis added).)

{87}    The operative language is whether "Dendreon elects to have GSK continue efforts to implement the Process" after August 1, 2011.   Dendreon paid GSK an Extension Fee for the month of August 2011.  The question is whether it must also pay Extension Fees for September and October 2011 after the notice of termination on September 1, 2011.

{88}    GSK has contended and the Court has accepted that the September 1, 2011 Termination Letter instructed GSK to cease manufacture within the meaning of DSA Section 14.3(a)(6).   The Court concludes that it would be inconsistent and unfair to conclude that the same letter represented Dendreon's election to have GSK continue efforts to implement the Process.   Having not so elected, Dendreon was not obligated to make further Extension Fees.

{89}    Unless Dendreon is deemed to have made a binding judicial admission that it is obligated for a payment the contract does not require, which the Court has determined it has not, GSK's right to payment for Extension Fees for the months of September and October 2011 would require a contract construction that Dendreon was obligated for a minimum of two month's Extension Fees simply because the DSA remained effective during the required sixty-day period following notice of termination.  The Court finds this interpretation unreasonable and an effort to imply a contract term that the parties had either elected or neglected to include. The contract provided for an unqualified right to terminate if Conformance Batches had not commenced b August 1, 2011.   The DSA could have but did not provide that such a termination triggered two months Extension Fees even if Dendreon elected not to have GSK continue efforts to implement the Process.

{90}    The Court concludes that the DSA's provision regarding payment of Extension Fees is not ambiguous.

{91}    Dendreon's conditional offer in the Termination Letter to pay Extension Fees after notice of termination if GSK accepted Dendreon's cancellation

of the Firm Order did not become a binding obligation to pay both Extension Fees and for a binding Firm Order that had not been cancelled. Allowing GSK to receive both Extension Fees and payment for the Firm Order of 700 grams of Product which preceded termination would afford GSK a unexpected windfall not anticipated by the contractual bargain between the parties.

{92}    To the extent that Dendreon's Motion seeks summary adjudication that it is not obligated to pay Extension Fees as a part of its termination obligation, Dendreon's Motion is GRANTED. To the extent that GSK's Motion can be read to seek summary adjudication that it is entitled to such Extension Fees, GSK's Motion is DENIED.

## B. GSK's Unfair and Deceptive Trade Practice Claim

{93}    The Court's determination that Dendreon was not obligated to pay Extension Fees following its notice of termination is dispositive of GSK's claim that Dendreon unlawfully attempted to coerce GSK to surrender its contractual rights by conditioning payment of Extension Fees that Dendreon knew that it owed. (Compl. ¶ 32.). The Court then must determine whether GSK is entitled to proceed on its claim that it was deceived or that Dendreon acted unfairly in engaging in pretext or making deceptive statements prior to terminating the DSA in order to reduce its termination obligations. The essence of the argument is that Dendreon tried to avoid or obfuscate its obligation to pay for the binding Firm Order which preceded termination. It seems obvious that any such effort failed to deceive GSK or to lead it to accept cancellation of the Firm Order.

{94}    Nevertheless, GSK contends that material issues of fact preclude summary adjudication of its claim. The Court disagrees.

{95}    Dendreon's representations that GSK contends were unfair or deceptive appear limited to statements or concealments in the several days immediately preceding the September 1, 2011 Termination Letter. More specifically, GSK complains that the August 22, 2011 forecast was misleading and knowingly false because Dendreon knew at the time it issued the forecast that it

would not need the Product as forecasted.  Of course, it is precisely that Product for which GSK seeks payment through its breach of contract claim.

{96}    Even construing the record in GSK's favor, the testimony and documents indicate that any deception in which Dendreon may be said to engage were close in time to the actual termination, and further at a time when other public statements would lead GSK to recognize that Dendreon would not actually require Product consistent with the forecast which it reaffirmed on August 22, 2011, as evidenced by GSK's own pleadings.  The August 22, 2011 forecast simply carried forward the same forecast that had been in place since the beginning of the DSA and as reflected in Schedule 4.1 of the DSA.   The asserted wrong is apparently that Dendreon did not reduce its Firm Order and advise GSK that it was expecting to terminate the DSA within a few weeks.

{97}    The Court concludes first that these facts, even if accepted, do not constitute aggravated facts adequate to elevate a breach of contract into an unfair and deceptive trade practice, and further do not forecast evidence that GSK can demonstrate any injury proximately caused by the conduct complained of, particularly where the Court has afforded GSK the right of payment on the binding Firm Order of 700 grams of Product.

{98}    The Court concludes that GSK is not entitled to proceed on a claim of unfair and deceptive trade practice which is grounded on the same facts as its breach of contract claim without further demonstrating any aggravating circumstances and without reasonably anticipated proof of any damage proximately caused which is in addition to rather than duplicative of remedies afforded by the breach of contract claim.

{99}    Accordingly, to the extent that Dendreon's Motion seeks summary adjudication against GSK's claim for unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1, Dendreon's Motion is GRANTED.

C. GSK's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

{100} The Court also concludes that the claim for breach of the implied covenant of good faith and fair dealing rests on the same facts as the breach of contract claim, and in light of the Court's holding on the breach of contract claim seeks no damage that is in addition to rather than duplicative of the breach of contract claim. Pursuant to New York contract principles, the implied covenant claim should not then further proceed.

{101} To the extent that it seeks summary adjudication that GSK is not entitled to proceed on its claim of a breach of the implied covenant of good faith and fair dealing, Dendreon's Motion is GRANTED.

## VI. CONCLUSION

{102} For the reasons expressed above, it is ORDERED, ADJUDGED, and DECREED that:

1. GSK is entitled to be paid and Dendreon shall pay GSK for the binding Firm Order of 700 grams of Product pursuant to section 14.3(a)(6) of the DSA;

2. GSK is not entitled to and Dendreon need not pay Extension Fees for the period between September 1, 2011 and October 31, 2011 pursuant to Section 2.4(a) of the DSA;

3. GSK's claim for unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1 is DISMISSED;

4. GSK's claim for breach of the implied warranty of good faith and fair dealing is DISMISSED;

5. GSK's Motion to the extent that it seeks summary adjudication that Dendreon has breached the DSA by its purported cancellation and failure to pay pursuant to the Firm Order is GRANTED;

6. Dendreon's Motion to the extent that it seeks summary adjudication that its termination obligations do not require the payment of Extension Fees is GRANTED; and

7. Except as expressly GRANTED, GSK's Motion and Dendreon's Motions are DENIED.

This the 4th day of November, 2014.